# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARYLON MARIE BOYD,
individually and as Executor of
the Estate of Cammerin Boyd,
deceased; ISABEL GONZALEZ, a
minor, by and through her
Guardian Ad Litem, Isela
Gonzalez; KANANI BOYD, a minor,
by and through her Guardian Ad
Litem, Kamilah Boyd,
              *Plaintiffs-Appellants,*

                    v.

CITY AND COUNTY OF SAN
FRANCISCO; HEATHER J. FONG;
JAMES O'MALLEY; TIMOTHY PAINE,
              *Defendants-Appellees.*

No. 07-16993

D.C. No.
CV-04-05459-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
July 14, 2009—San Francisco, California

Filed August 7, 2009

Before: Barry G. Silverman, Richard R. Clifton and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

10611

## COUNSEL

Jay B. Shapiro, Forman & Associates, San Rafael, California, for the plaintiffs-appellants.

Dennis J. Herrera, Joanne Hoeper, Blake P. Loebs, Scott D. Wiener (argued), and Erin Bernstein, San Francisco City Attorney's Office, San Francisco, California, for the defendants-appellees.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiffs-Appellants Marylon Marie Boyd, Isabel Gonzales, and Kanani Boyd (the Boyd Family), who are the mother and daughters of Cammerin Boyd (Cammerin), appeal the district court's judgment in favor of Defendants-Appellees, the City and County of San Francisco and police officers James O'Malley and Timothy Paine (collectively, San Francisco). The Boyd Family alleges that the district court's erroneous admission of irrelevant and prejudicial evidence tainted the jury's verdict such that reversal is warranted. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Cammerin was shot and killed by Officer Paine of the San Francisco Police Department on May 5, 2004. Earlier that evening, Cammerin had attempted two separate kidnappings within minutes of each other. He first assaulted Tiffany Williams and then Tatanika Hogan at gunpoint, instructing each woman to get into his car. Both women resisted and fled. After escaping from Cammerin, Hogan promptly contacted a police officer, who reported the incident over the radio and began to pursue the sports utility vehicle (SUV) Cammerin was driving,[1] resulting in a high-speed chase through a San Francisco neighborhood. During the chase, Cammerin leaned out the window of the SUV and fired twice at the pursuing officers. Officer Paine, who joined the pursuit, fired back at Cammerin's SUV as it drove past, hitting the front hood.

Cammerin finally stopped his vehicle on Larch Way in San Francisco and was quickly surrounded by San Francisco police officers, who approached the vehicle with their guns drawn. The police ordered Cammerin out of the vehicle and, when he emerged, commanded him to put his hands up and get down on the ground. Witnesses testified that Cammerin put his hands up but did not get on the ground; instead, he walked towards the officers and then back to the SUV. When Officer Paine perceived that Cammerin did not comply fully with the commands, but instead reached back into the vehicle, Officer Paine fired three times, striking Cammerin twice and fatally wounding him.

About two weeks prior to Cammerin's death, Oakland police performed an investigative stop on Cammerin's vehicle and searched its interior. During that search, they discovered rap lyrics along with a newspaper article regarding the murder of an Oakland police officer. The rap lyrics, which Cammerin

---

[1]The vehicle had been rented by Cammerin's mother, Marylon Boyd, after the Oakland police impounded her Mercedes.

acknowledged were his, advocated prostitution and the murder of police officers.

On May 2, three days before the shooting, Oakland police had arrested Cammerin for recklessly driving Marylon Boyd's new Mercedes through the city streets. The officers had ordered Cammerin out of the car and commanded him to show his hands and get down on the ground, all of which he did without assistance, despite the fact that he had two prosthetic legs. Cammerin's lower legs were amputated following a car crash in 1993, in which Cammerin ran into a light pole after attempting to evade a California highway patrol officer by speeding off the freeway with his lights extinguished. During the May 2 arrest, Cammerin struggled with the officers during handcuffing, repeatedly screaming at them to "kill me," and calling them "filthy white racists."

The Boyd Family sued San Francisco for Cammerin's death, claiming excessive use of force.[2] In its defense, San Francisco presented the expert testimony of Dr. Emily Keram, a forensic psychiatrist. Dr. Keram testified that her analysis of the circumstances surrounding Cammerin's death led her to conclude that he had been attempting to commit "suicide by cop," and had purposefully drawn police fire to accomplish this result. The Boyd Family objected to the admission of Dr. Keram's expert testimony, and to other evidence regarding Cammerin's past. Following a six-week trial and three hours of deliberation, a jury ruled in favor of the defendants. The Boyd Family appeals the resultant judgment to this court on the basis that the district court abused its discretion in allowing the admission of improper evidence at trial.

---

[2]Additional police officers were dismissed as defendants and the Boyd Family's claim under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*, was withdrawn prior to trial.

## STANDARD OF REVIEW

We review a district court's decision to admit evidence under an abuse of discretion standard. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *United States v. Curtin*, 489 F.3d 935, 943 (9th Cir. 2007) (en banc).[3] We do not reverse the district court's decisions under an abuse of discretion standard unless we are "convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000). A party seeking reversal for evidentiary error must show that the error was prejudicial, and that the verdict was "more probably than not" affected as a result. *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003) (internal quotation marks omitted).

## DISCUSSION

The Boyd Family challenges the admission of the following evidence: (1) testimony of the 1993 high-speed chase precipitating the loss of Cammerin's legs; (2) testimony of Cammerin's criminal history, including the kidnapping attempts and the likely term of incarceration he would have faced had he survived; (3) testimony regarding Cammerin's Oakland arrest, including his statements to police; (4) evidence that Cammerin had drugs in his system at the time he was shot; (5) evidence of prior lawsuits filed by Cammerin or by his mother on his behalf against law enforcement agencies; (6) evidence of the rap music lyrics and newspaper clipping found in Cammerin's car; and (7) Dr. Keram's expert testimony regarding the suicide by cop theory. In challenging this evidence, the Boyd Family cites relevancy and prejudice concerns under

---

[3]Although the Boyd Family appears to concede this standard in its briefs, at oral argument its counsel attempted to persuade us that we should review the district court's decision to admit expert testimony on the suicide by cop theory de novo. Because the Boyd Family failed to raise this claim in the briefs, we do not address it in this opinion.

Federal Rules of Evidence 401, 402, 403, 404, 702 and 703. The Boyd Family also asserts that admission of the evidence more likely than not affected the jury verdict by creating confusion as to the issues, and by prejudicing the jury against Cammerin.

## I.   Relevance — Federal Rules of Evidence 401 and 402

Only relevant evidence, defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," is admissible in federal court. Fed. R. Evid. 401, 402. Evidence may be relevant even if it is redundant or cumulative, or if it relates to undisputed facts. *Old Chief v. United States*, 519 U.S. 172, 179 (1997).

The Boyd Family challenges the relevancy of most of the evidence listed above, as Officer Paine did not know of its existence prior to shooting Cammerin, and the only issue in front of the jury was whether Officer Paine's actions were reasonable based on his perspective at the time. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *see also Palmquist v. Selvik*, 111 F.3d 1332, 1341 (7th Cir. 1997) (upholding the magistrate judge's evidentiary ruling to exclude evidence that the victim of a police shooting wanted to be killed by the police, on the ground that the evidence was not relevant to the objective reasonableness test, as the events immediately prior to the use of force were undisputed).

[1] The Boyd Family alleged, and presented evidence at trial, that Cammerin had been attempting to surrender, and had been leaning against the car for assistance in lowering himself to the ground when police shot him. Officer Paine testified that he fired after Cammerin ignored police commands

to surrender and instead sat down on the dashboard of the SUV and reached both hands inside, as if to grab something. In a case such as this, where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible. *See Graham*, 490 U.S. at 399 n.12 (indicating that a factfinder may consider outside evidence "in assessing the credibility of an officer's account of the circumstances that prompted the use of force"); *Billington v. Smith*, 292 F.3d 1177, 1180-82, 1184-85 (9th Cir. 2002) (noting witness reports and the decedent's blood alcohol content in analyzing reasonableness in an excessive force case).

**[2]** Under the relevancy analysis prescribed by the Federal Rules, all of the challenged evidence was properly admitted, since it had a tendency to make a fact of consequence more or less probable. Fed. R. Evid. 401. The Boyd Family claimed that Cammerin hesitated in obeying police commands to get down only because of his lack of mobility due to his prostheses. This fact is made less probable by evidence that three days prior, Cammerin had exhibited a facile ability to get down on the ground without assistance, when he was arrested in Oakland after a similar high-speed pursuit. On the other hand, police assertions that Cammerin was acting erratically, taunting police and goading them to shoot him instead of following police commands, is made more probable by Cammerin's earlier statements to Oakland police, as well as evidence that he was on drugs at the time.

**[3]** Cammerin's alleged resistance to the police is also made more probable by evidence, in the form of expert testimony, that his actions were consistent with an attempt to commit suicide by cop. Cammerin's alleged actions, in the context of the suicide by cop theory, are made more probable by evidence that he had previously brought lawsuits against the police department, and was therefore fully aware of the possibility that his family could receive substantial damages from such a suit if a police officer killed him. Evidence that

Cammerin wrote rap lyrics praising the murder of police officers also makes actions consistent with suicide by cop more probable, as the professional literature indicates that individuals who attempt suicide by cop often harbor a deep hatred and resentment towards police officers. Additionally, the circumstances of the 1993 car crash, a traumatic and life-changing event in Cammerin's life that could be tied to police action, made it more probable that Cammerin resolved to place liability for his death on the police. Finally, Cammerin's criminal history, particularly the two kidnapping attempts that provoked the high-speed chase and the potential sentence that he faced if prosecuted for those actions, made it more probable that Cammerin was trying to provoke a police shootout, rather than trying to surrender.

## II.   Expert Testimony — Federal Rule of Evidence 702

In disputing the relevance of the challenged evidence, the Boyd Family target Dr. Keram's expert testimony in particular. They assert that the district court failed in its role as a gatekeeper of the evidence by allowing Dr. Keram's testimony regarding suicide by cop.

**[4]** The Federal Rules of Evidence allow expert testimony that will assist a trier of fact in understanding the evidence or in determining a fact in issue, so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. It is the trial judge's responsibility to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In making this determination, the judge must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93.

Although "[m]any factors will bear on the inquiry," some of the considerations considered relevant by the Supreme Court to such an assessment include: (a) whether the theory or technique can and has been tested; (b) whether the theory or technique has been subjected to peer review and publication; (c) the known or potential rate of error for the technique; and (d) the theory or technique's general degree of acceptance in the relevant scientific community. *Id.* at 593-94.[4]

After a lengthy hearing outside the presence of the jury in which both parties had the opportunity to examine Dr. Keram, the district court admitted her testimony. The trial judge, noting that she "started out rather skeptical of this whole subject[, a]nd in particular, its application to this case," ultimately concluded that Dr. Keram was "a principled witness" with highly trained expertise, who did not appear "to be favoring one side or the other."

[5] The district court then examined Dr. Keram's testimony using each of the four *Daubert* factors. The court noted that while the suicide by cop theory could not be tested "in the sense of running a scientific experiment[,] . . . there have been a number of studies conducted" supporting the validity of the theory. Those studies analyzed the methods used in the field of psychiatric forensics for attempting to reconstruct an individual's state of mind after the fact, based on evidence of his actions and his surrounding circumstances. Dr. Keram testified that the studies performed under this method were extremely strict in their requirements, to guard against the registering of false positives. Dr. Keram was careful to tie her conclusions in this case to the literature on suicide by cop,

---

[4]The Supreme Court has taken care to explain that "a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co.*, 526 U.S. at 141.

noting recognized factors or connections supporting her opinion. Dr. Keram testified to knowing of approximately ten peer-reviewed articles and four non-peer-reviewed publications on the subject.[5] Regarding the rate of error for the theory, the court noted Dr. Keram's testimony that the selection criteria used in the relevant studies erred heavily on the side of exclusion, designating situations as an example of suicide by cop only if they met a very high bar. Finally, the court noted that the theory appeared to be generally accepted in the relevant professional community, with a high number of publications written in support of the theory and no contrary articles or studies. Based on these factors, the court concluded that the testimony satisfied *Daubert*'s requirements for admission.

The Boyd Family seeks to challenge the district court's conclusion by attacking the validity of the theory, but provides no scientific opinions challenging or refuting it. Indeed, they present no evidence, outside of their own assertions, that the theory is unreliable, nor do they dispute the existence of multiple peer-reviewed articles in support of the theory. They criticize the methodology used to test for possible suicide by cop, but present no alternative, more reliable methods, nor their own expert to rebut Dr. Keram's conclusions. Finally, they challenge Dr. Keram's conclusions by asserting essentially that, had they been the experts, they would have reached a different conclusion based upon the evidence.[6]

---

[5]We acknowledge that both the Fifth and Seventh Circuits have also made reference to the suicide by cop theory. *See, e.g.*, *Hainze v. Richards*, 207 F.3d 795, 797 n.1 (5th Cir. 2000); *Plakas v. Drinksi*, 19 F.3d 1143, 1146 (7th Cir. 1994).

[6]The Boyd Family also challenges Dr. Keram's testimony for "assuming as true" the testimony of San Francisco's witnesses rather than relying only on undisputed facts, asserting that "Dr. Keram failed to either account for [ ] contrary evidence in her theory or admit that she could not, as she would have if she had adopted a scientifically valid approach rather than cherry-picking the evidence that supported her theory." This assertion

**[6]** *Daubert* makes clear that the role of the courts in reviewing proposed expert testimony is to analyze expert testimony in the context of its field to determine if it is acceptable science. "It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. In this case, the district court was satisfied that Dr. Keram's testimony regarding suicide by cop "pass[ed] muster." Based on our review, we agree, and conclude that the district court did not abuse its discretion in admitting Dr. Keram's testimony.

### III.   Prior Bad Acts — Federal Rule of Evidence 404(b)

**[7]** Evidence of crimes, wrongs, or prior bad acts is inadmissible "to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, evidence of earlier behavior is admissible for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." *Id.* As we have indicated in prior cases, Rule 404(b) is a "rule of inclusion . . . [; u]nless the evidence of other crimes tends only to prove propensity, it is admissible."

---

misstates the record. During the *Daubert* hearing, on cross-examination, Dr. Keram specifically acknowledged that her analysis involved analyzing facts that more or less would support the theory. In reviewing those facts, she indicated that she ultimately honed in on those that "provide[d] the best explanation for the evidence as it stands. There may be things that contradict what you end up thinking is the best explanation . . . . But what you're trying to do is create the most consistent diagnosis or scenario or explanation. And recognizing, absolutely, that there will be factors or evidence or symptoms or whatever, that — that may either not support or — you know, be neutral, or directly contradict your opinion."

On further questioning by the court, Dr. Keram also indicated that, as she noted in her report, she drew conclusions based on certain assumptions, being careful to designate when she relied on disputed evidence.

*United States v. Jackson*, 84 F.3d 1154, 1159 (9th Cir. 1996) (internal quotation marks omitted). The intent behind the rule is not to "flatly prohibit the introduction of such evidence," but to limit the purpose for which it may be introduced. *Huddleston v. United States*, 485 U.S. 681, 687 (1988).

The Boyd Family challenges the district court's admission of Cammerin's prior bad acts tending to support the suicide by cop theory using the argument that the evidence was inadmissible under Federal Rule of Evidence 404(b). The Boyd Family points out that this evidence served to convince the jury that Cammerin acted in a suicidal fashion at the time he was shot because it shows he had suicidal tendencies. This connection, they argue, is precisely what Rule 404(b) was intended to prevent.

**[8]** This argument fails because the admission of evidence in support of the suicide by cop theory falls within the large exception for otherwise inadmissible character evidence carved out in Rule 404(b). To the extent that being shot by the police was Cammerin's plan, intent, or motive, the evidence supporting the theory of suicide by cop is admissible. Therefore, the district court did not abuse its discretion by admitting this evidence under Rule 404(b). *See Curtin*, 489 F.3d at 944 (noting that once it has been established that the evidence at issue serves an admissible purpose, such as establishing motive or intent, the only conditions justifying the exclusion of the evidence are those set forth in Rule 403).

### IV.   Prejudice — Federal Rules of Evidence 403 and 703

**[9]** Otherwise relevant and admissible evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. In addition, "[t]he facts or data in the par-

ticular case upon which an expert bases an opinion or inference . . . that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703.

The Boyd Family asserts that the evidence described above, including that given in support of the suicide by cop theory, warranted exclusion because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. *See United States v. Yazzie*, 59 F.3d 807, 811 (9th Cir. 1995) ("Evidence is unfairly prejudicial if it 'makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant *wholly apart from its judgment as to his guilt or innocence of the crime charged.*'") (quoting *United States v. Johnson*, 820 F.2d 1065, 1069 (9th Cir. 1987)). The district court weighed each piece of evidence in considering the parties' motions in limine and admitted the evidence on the basis that its probative value outweighed any potentially prejudicial effect. Under an abuse of discretion review, we determine that all the evidence, with the exception of the rap music lyrics unrelated to police, was properly admitted.

## A.    Evidentiary Error

The decision to admit potentially prejudicial evidence under Rule 403 is " 'committed to the sound discretion of the trial court.' " *United States v. Blitz*, 151 F.3d 1002, 1008 (9th Cir. 1998) (quoting *United States v. McDonald*, 576 F.2d 1350, 1356 (9th Cir. 1978)). Proof that evidence was prejudicial to one party is insufficient to establish that the prejudice was unfair, or that the trial court abused its discretion in weighing that prejudice against the evidence's probative value. *Id.* at 1009. " 'As long as it appears from the record as a whole that the trial judge adequately weighed the probative

value and prejudicial effect of proffered evidence before its admission, we conclude that the demands of Rule 403 have been met.' " *United States v. Verduzco*, 373 F.3d 1022, 1029 n.2 (9th Cir. 2004) (quoting *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir. 1978)); *see also Harman,* 211 F.3d at 1175 ("Normally, the decision of a trial court is reversed under the abuse of discretion standard only when the appellate court is convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances.").

The district court admitted a large portion of the challenged evidence in conjunction with its decision to allow expert testimony regarding the suicide by cop theory. The court accepted Dr. Keram's testimony that the 1993 high-speed chase was highly probative of Cammerin's intent, as suicides and attempted suicides occur more frequently around significant anniversaries, and as Cammerin was shot around the eleven-year anniversary of the car crash that resulted in the loss of his legs. The court also found the circumstances surrounding the accident to be particularly probative, since they made it more likely that Cammerin blamed the police for his loss and would seek retribution from them by exposing them to liability, while at the same time accomplishing his own suicide.

The court further ruled that evidence of Cammerin's arrest in Oakland three days before was highly probative, as it represented a "practice run," which Dr. Keram testified is a telltale sign frequently observed in cases of suicide by cop. In addition, the prior lawsuits filed by Cammerin or by others on his behalf were probative to establish that Cammerin was familiar with assertions of police liability and with the possibility that his family could receive substantial damages were they able to establish police liability for his death.

The district court also admitted Cammerin's criminal history as more probative than prejudicial, concluding that the sentence he was facing were he convicted of the kidnappings

was relevant to his willingness to commit suicide, particularly in light of testimony that he had experienced particular difficulties while serving an earlier prison sentence. Evidence of Cammerin's past incarceration was also held relevant to the issue of damages. The Boyd Family's claims for damages were rebutted in part by testimony that, particularly with regards to his daughters, Cammerin had spent a large portion of their lives behind bars. However, the district court excluded evidence that would explain why Cammerin had been imprisoned in the past, finding that evidence more prejudicial than probative.

The district court ruled that evidence that Cammerin was on drugs at the time of the shooting was highly probative of his conduct, particularly in light of his alleged erratic behavior on Larch Way.

Finally, the court admitted the rap lyrics found in Cammerin's car as highly probative of Cammerin's animosity towards police officers, thereby outweighing the potential prejudice of the offensive language.

[10] With the exception of part of its ruling on the rap lyrics, we conclude that none of the district court's rulings concerning the admission of evidence under Rules 403 and 703 constituted an abuse of discretion. The court provided reasonable justification for each ruling, sufficient to meet the highly deferential standard of review for evidentiary rulings. *See Harman*, 211 F.3d at 1175. The record reflects that the court conscientiously weighed the probative value against the prejudicial effect for each piece of evidence, which is a showing sufficient for affirmance. *Verduzco*, 373 F.3d at 1029 n.2.

[11] However, with regards to the rap lyrics, the district court provided no justification nor explanation for its admission of certain portions of the lyrics. Although the district court admitted the lyrics on the ground that they demonstrated an animosity towards the police, the court neglected to

exclude the portions of the lyrics that had nothing at all to do with police officers, but instead referenced and advocated prostitution.[7] Failure to exclude these lyrics was error, as they had no probative value regarding Cammerin's alleged activities on Larch Way, and were unfairly prejudicial in light of their offensive nature.

### B.    Prejudice

**[12]** As we have determined that the district court erred by admitting a portion of the rap lyrics, we must consider whether that error affected the outcome of the trial. "To reverse on the basis of an evidentiary ruling, this Court must conclude both that the district court abused its discretion and that the error was prejudicial." *McEuin*, 328 F.3d at 1032. When error is established, we must presume prejudice " 'unless it is more probable than not that the error did not materially affect the verdict.' " *Obrey v. Johnson*, 400 F.3d 691, 701 (9th Cir. 2005) (quoting *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc)). Based on our review of the record and of the evidence, we conclude that the Boyd Family was not prejudiced by the admission of the rap lyrics, because it is more probable than not that the jury would have found for the defendants even without their admission.

**[13]** The overall strength of San Francisco's case, aside from the erroneously admitted rap lyrics, supports our conclusion that the jury's verdict was not tainted. The testimony supporting the Boyd Family's version of Cammerin's actions prior to the shooting was suspect for a variety of reasons, not least of which was the lack of reliable witnesses. The witnesses who did testify on behalf of the Boyd Family generally had a demonstrated history of animosity towards the San Francisco Police Department, and, in some instances, a long

---

[7]The rap lyrics were presented in part as follows: "Bitches are to be pimped in this world for money . . . . And when these bitch ass pigs trying to f**k up your pimping, split the cop's wig and keep moving always."

rap sheet with multiple arrests and convictions. In addition, their testimony was often contradictory and, at the very least, inconsistent. Evidence of Cammerin's prior actions, particularly his encounter with Oakland police days earlier, in which he was able to obey police commands without assistance, renders the Boyd Family's assertions that Cammerin was attempting to surrender highly suspect. Cammerin's behavior just prior to the shooting, including two kidnapping attempts, engaging in a high-speed chase, and firing at the police, also supports San Francisco's version of the facts, including the conclusion that Officer Paine acted reasonably when he fired on Cammerin. The fact that the jury took only three hours to conclude that San Francisco was not liable for Cammerin's death also lends support to our ruling.

**[14]** In the absence of prejudice, the district court's failure to exclude those portions of the rap lyrics that were more prejudicial than probative constitutes harmless error, and does not warrant reversal of the jury's verdict.

**AFFIRMED.**