TYMKOVICH, Chief Judge.
Three Albuquerque Police Department officers shot Stephan Cordova^ after he raised a gun in their direction. Cordova survived and was charged with assault, although the charges were later, dismissed on speedy trial grounds. Cordova then brought this action under 42 U.S.C. § 1983, claiming primarily (1) that the charges of assault were brought in bad faith; (2) that the police unreasonably prevented interaction with his family when he was in a hospital recovering from his wounds; and (3) the police used excessive force by firing on him without an adequate warning. The district court allowed only the Fourth Amendment excessive-force claims to go to trial, where a-jury returned a verdict for the officers.
We find no error in the district court’s conclusions. As we explain below: (1) under the facts of this case, the dismissal of the assault charges under the Speedy Trial Act is not indicative of Cordova’s innocence and thus does not qualify as a favorable termination for purposes of a malicious prosecution cause of action; (2) Cordova’s familial-association claim fails because the prohibition on visitors was not intended to interfere with a protected relationship and was reasonably related to a legitimate government purpose; and (3) as to the excessive force claim, Cordo-va was adequately warned to drop a weapon he was wielding at the time of the shooting, and the district court correctly instructed the jury as to the applicable law.
Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.
I. Background
Stephan Cordova became ill at his work site. He called his mother for a lift to his brother’s house, where he was living. After his mother left him, his sister-in-law checked on him and found him seriously ill. She called an ambulance, believing that Cordova was having a heart attack. Cor-dova refused her offer to drive him to the hospital and told her that he would not get in the ambulance. When she told him that he had to go, he replied that he did not have to go anywhere because he had a gun.
When paramedics arrived, the sister-in-law told them that he was refusing treatment and that he had -a gun. - The Albuquerque Police were called, and officers Fox, Hoisington, Neiberger, and Kees responded. The officers quickly learned of his threats and instructed family members to leave the house. Officer Fox was also told about Cordova’s physical- condition and that he was in the middle of a difficult divorce. Officer Fox thought, at that point, Cordova might be suicidal.
Cordova eventually exited the house. The officers approached him and asked him to' stop and show his hands before moving further. Cordova began walking backward down the. street and Officer Kees noticed that Cordova had a gun in his waistband. According to the officers, he kept touching the gun at his waist, despite their repeated warnings to keep his hand away.
Cordova then drew the gun slowly, and held it at his waist, pointing down. Sergeant Fox then ordered Cordova to drop the gun. The three officers then claim to have simultaneously observed Cordova raising the gun in their direction, and all three fired, hitting Cordova eight times. After the shooting, Cordova was taken to a hospital for emergency surgery. During recovery, officers restricted access to his hospital room until he was able to speak with investigators.
*650 Because of his injuries, .Cordova was unable to communicate for five days. When he was finally well enough to speak with police, he invoked his right to counsel. The police lifted the access restriction but did not intend for him to be released from the hospital. The police also charged him with assault and an arrest warrant was issued by a state court.
While still ih the hospital, Cordova filed a motion to dismiss the complaint, quash the warrant, and to waive his first appearance. A court later set bond, and in an order setting .conditions of release, the judge handwrote “D to remain in custody at [the hospital] until further notice.” App. at 691. Despite the order, the next day the hospital discharged Cordova and detectives transferred him to a county dev tention center.
Cordova was later indicted, but moved to dismiss the indictment on the grounds that he had not been given an opportunity to present exculpatory evidence to the grand jury. The state court granted this motion to dismiss. Cordova was then re-indicted, and' after a two-year .delay again moved to dismiss the indictment on the grounds that the trial court had given an erroneous jury instruction. Undeterred, the state again indicted Cordova. He moved to dismiss this indictment on speedy trial grounds, given that nearly five years had passed from the filing of the initial criminal complaint. Over, the state’s objection, the court granted the. motion.
Cordova then brought this -action under 42 U.S.C. § 1983 alleging a variety of federal constitutional violations, including excessive force, malicious prosecution and in-terferenee with his right to associate with his family.
II. Analysis
Cordova alleges the district court erred in granting summary judgment on his § 1983 malicious prosecution, familial association, and due process claims. For his excessive force claims, he contends the district court should have entered judgment in his favor or, at least, allowed a new trial because of a variety of trial and instructional errors.[1]
We discuss each of Cordova’s claims in turn.

A. Malicious Prosecution

The district court granted summary judgment on Cordova’s malicious-prosecution claim because he failed to establish, as a matter of law, that the charges against him were terminated in his favor. He challenges the district court’s conclusion, contending that the dismissal of charges against him under New Mexico’s Speedy Trial Act constituted a favorable termination.
To prevail on a § 1983 malicious-prosecution claim, a plaintiff must show: (1) the defendant caused the plaintiffs confinement or prosecution; (2) the original action terminated in the plaintiffs favor; (3) there was no probable cause to confine or prosecute the plaintiff; (4) malice; and (5) damages. Wilkins v. DeReyes, 528 F.3d 790, 799 (10th Cir.2008). It is the plaintiffs burden to show that the termination was favorable. Id. at 803. Although the dismissal of the assault charges certainly worked to Cordova’s benefit, we agree with the district court that it was not *651 a favorable termination under prevailing law.
We most recently analyzed the contours of the favorable termination requirement in Wilkins. There, the prosecutor had dismissed the underlying charges by filing a so-called nolle prosequi—a voluntary dismissal of charges. Id. at 802. We found the mere fact that a prosecutor had chosen to abandon' a case was insufficient to show favorable termination. Instead, the termination must in some way “indicate the innocence of the accused.” Id. at 803 (quoting Restatement (Second) of Torts § 660 cmt. a (1977)). When it is unclear whether the termination indicates innocence, we “look to the stated reasons for the dismissal as well as to the circumstances surrounding it” and determine “whether the failure to proceed implies a lack of reasonable grounds for the prosecution.” Id. (quoting Murphy v. Lynn, 118 F.3d 938, 948 (2d Cir.1997)), Or, as a, leading treatise put it, the abandonment of prosecution that “does not touch the merits ... leaves the accused without a favorable termination.” Dan B. Dobbs et al., Dobb’s, Law of Torts § 590 (2d ed.2015).
In this case, Cordova’s assault chargés were dismissed on speedy trial grounds after a series of procedural blunders by the prosecution that resulted in three failed indictments. The original indictment was dismissed because the state failed to give Cordova the opportunity to testify before the grand jury. The state then obtained a second indictment but Cordova obtained' a dismissal two years later because the grand jury was never instructed on a necessary element of the charges. After the grand jury returned a third indictment, the trial court dismissed the action: with prejudice' on speedy trial grounds over the state’s objection, reasoning that Cordova had been prejudiced by the repeated delays. This whole process took approximately five years.
As an initial matter, Cordova has not presented any argument'that the length of the process was attributable to intentional delay or the prosecution’s misgivings about the likelihood of a conviction. After the third indictment, the state explained that part of the delay was due to its prosecutor being new to the case and needing to catch up. In addition, the state court found Cordova had failed to invoke his speedy trial rights in a clear and timely manner during the pendency of the third indictment. And, in fact, prior to. the third dismissal, the. state expressed its desire and readiness to proceed to trial. Applying Wilkins, the district court found the underlying charges were dismissed on technical, procedural grounds which had nothing to do with the merits of the case. Given these undisputed facts, we agree with the district, court that the circumstances surrounding this dismissal are not indicative of Cordova’s innocence.
, Cordova asks us to set aside our indicative-of-innocence standard and find that speedy .trial dismissals are per se favorable. In support of his position, he cites to Second Circuit cases and a New York state court case holding that a dismissal under New York’s Speedy Trial Act qualifies as a favorable termination. See Rogers v. City of Amsterdam, 303 F.3d 155 (2d Cir.2002); Smith-Hunter v. Harvey, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, 755 (2000); see also Posr v. Court Officer Shield No. 207, 180 F.3d 409 (2d. Cir.1999); Murphy v. Lynn, 118 F.3d 938 (2d Cir. 1997).
•These cases find speedy trial dismissals qualify as favorable terminations for three reasons. First,- they have reasoned that a state’s failure to proceed in a timely manner usually indicates- a lack of reasonable grounds for prosecution. See, e.g., Mur *652 phy, 118 F.3d at 951. While this may be true, we see no reason to adopt a per se rule prohibiting district courts from considering the circumstances of each dismissal. As is the case here, there will doubtless be instances where the dismissal at issue is attributable to technical or procedural errors that do not reflect the merits of the underlying charges.
Second, these cases theorize that any other rule would incentivize prosecutors to abandon weak charges rather than dismissing them outright, allowing them to obtain speedy trial dismissals and thus avoid malicious prosecution claims. Rogers, 303 F.3d at 160. Again, individual consideration of the circumstances surrounding each dismissal adequately addresses this concern. See Smith-Hunter, 712 N.Y.S.2d 438, 734 N.E.2d at 756. Nothing in our opinion prevents district courts from finding that unexplained delay indicates a lack of reasonable grounds for prosecution.
Even the Second Circuit’s Murphy decision supports our determination, that not all speedy trial dismissals qualify as favorable terminations. In Murphy, the prosecution failed to present any explanation for its delay in bringing the defendant to trial. 118 F.3d at 951. As a result, the district court held that the prosecution’s unexplained delay was prima facie proof of favorable termination. Id. The court noted, however, that the state could rebut this presumption if someone from the prosecutor’s office were to testify that the delay was attributable to circumstances unrelated to the merits of the case. Id. The Second Circuit endorsed this approach, concluding, “Defendants chose not to call the assistant district attorney as a trial witness to offer any non-merits-based explanation for the failure to proceed against Murphy. Accordingly, the district court properly decided the favorable-termination question as a matter of law....” Id. We are thus in agreement with both Murphy and the majority of other courts in holding that speedy trial dismissals do not per se constitute favorable terminations.
, The final argument made in the New York line of cases is that basic fairness requires us to recognize speedy trial dismissals as favorable. They argue that it would be unjust to force a criminal defendant to choose between enforcing his speedy trial rights and maintaining the ability to bring a malicious prosecution action. But these cases fail to recognize that such trade-offs are a standard feature of malicious prosecution law. Courts routinely find that dismissals resulting from a defendant’s exercise of his statutory (or even constitutional) rights are not favorable for the purposes of a later malicious prosecution claim. For example, as noted in Wilkins, a termination may not be favorable even when the charges are abandoned. This' is the case, for example, when key evidence is ruled inadmissable. When “evidence [is] only suppressed on ‘technical’ grounds having no or little relation to the evidence’s trustworthiness, then the fact that there [is] not other sufficient evidence [is] not ... indicative of innocence.” Wilkins, 528 F.3d at 804 (quoting Dobiecki v. Palacios, 829 F.Supp. 229, 235-36 (N.D.Ill.1993)).
In short, these cases are based on a different understanding of the favorable termination requirement than we endorsed in Wilkins. Wilkins adopted the traditional common law element that a dismissal must “indicate the innocence of the accused” to qualify as a favorable termination. Wilkins, 528 F.3d at 803 (quoting Restatement (Second) of Torts § 660 cmt. a (1977)). But in Smith-Hunter, the New York Court of Appeals rejected the traditional rule, holding that any dismissal that is “not inconsistent ” with innocence quali *653 fies as “favorable.” 712 N.Y.S.2d 438, 734 N.E.2d at 755 (emphasis added). Not only is Smith-Hunter’s conception of the favorable termination requirement at odds with the rule we adopted in Wilkins, it flips the traditional rule on its head by presuming terminations are favorable until proven otherwise. As a result, both Smith-Hunter and the Second Circuit’s Rogers decision, 303 F.3d at 160 (applying Smith-Hunter and holding that- a speedy trial dismissal is a favorable termination under New York law), are of limited persuasive value. .
Applying our indicative-of-innocence rule, many courts have found that an abandonment is not favorable even when the crucial evidence was suppressed on constitutional grounds.[2] In all of these instances, it was the defendant’s exercise of his constitutional right to exclude certain evidence that led to the dismissal. Courts often find that no favorable termination has occurred despite the exercise of statutory or constitutional rights resulting in the termination of a case.[3] In fact, most courts follow the Wilkins approach and look to . the circumstances surrounding speedy trial dismissals to determine whether they indicate the innocence of the accused.[4] That Cordova had a statutory right to dismissal under the Speedy Trial Act thus does not set aside his burden of meeting the indicative-of-innocence requirement.
Thus, a plaintiff generally cannot maintain a malicious prosecution action unless his charges were dismissed in a manner indicative of innocence, even when he was entitled to dismissal on statutory- or constitutional grounds. Although this rule may produce a dilemma for defendants at least in some applications, -it is both-a standard feature of the tort of malicious prosecution and a reflection of the idea that malicious prosecution actions are disfavored at common law.( See Hernon v. Revere Copper & Brass, Inc., 494 F.2d 705, 707 (8th Cir. 1974) (“[T]he general rule is that suits for malicious prosecution are, viewed with dis *654 favor and are to be carefully guarded against.”). '
A speedy trial dismissal, moreover, is unlike the nolle prosequi in Wilkins, in which the prosecution merely dropped the charges. This action by the prosecution is ambiguous, in that we cannot know'the reasons ‘for dropping the charges. Here, by contrast, the state court unambiguously granted a motion to dismiss the charges against Cordova. But this distinction is irrelevant. The question we must ask is whether the dismissal was indicative of innocence. It cannot be the case that all dismissals that result from granted motions are favorable terminations, for purposes of malicious prosecution actions. The dismissal here - does not indicate Cor-dova’s innocence, so it is not a favorable termination.
The favorable termination requirement thus serves as a useful filtering mechanism, barring actions that have not already demonstrated some likelihood of success. Although the traditional requirement may bar some meritorious actions, where prose-cutorial delay does indicate the innocence of the accused the plaintiff will not be barred from bringing his malicious prosecution claim under our rule. Our conclusion is thus more receptive to Cordova’s fairness concerns than many applications in this area of the law traditionally are—a dismissal due to a lack of jurisdiction or of admissible evidence will rarely reflect on the merits of the case and is therefore more likely to, bar a meritorious claim. Nor, we should emphasize, does a dismissal of charges create a presumption of innocence or shift the burden of proving’the element of favorable termination to the defendant.
In sum, we agree with the district court that the dismissal of the underlying assáult charges under New Mexico’s Speedy Trial Act was hot indicative of Cordova’s innocence. The undisputed facts reveal the prosecution did not abandon its effort to try Cordova, and nothing suggests the speedy trial dismissal indicated his innocence of the charged crime. Absent such a showing, the district court properly granted summary judgment on the malicious prosecution claim.

B. Familial Association

Cordova next challenges the district court’s dismissal of his familial association claim. The court found Cordova had not pointed to any facts that would allow a reasonable jury to conclude the officers intended to interfere with a protected relationship.
“Th[e] right to familial association is grounded in the Fourteenth Amendment’s Due Process Clause.” Lowery v. Cty. of Riley, 522 F.3d 1086, 1092 (10th Cir.2008), To prevail on a familial-association claim, a plaintiff must make two showings: (1) that the defendants “intended to deprive [him] of [his] protected relationship,” and (2) that balancing the individual’s interest in the protected familial relationship against the state’s interests in its actions,- defendants either “unduly burdened ‘plaintiff’s] protected relationship, or effected an unwarranted intrusion into that relationship.” Thomas v. Kaven, 765 F.3d 1183, 1196 (10th Cir.2014) (citations and internal quotation marks omitted). But “not every statement or act that results in an .interference with the right of familial association is actionable. The conduct or statement must be directed at the familial relationship with knowledge that the statements or conduct will adversely affect that relationship.” Id. (quoting J.B. v. Washington Cty., 127 F.3d 919, 927 (10th Cir.1997)) (emphasis added). Put differently, to satisfy the first prong of the test, a plaintiff must allege the defendants had the “intent to interfere” with -a partic *655 ular protected relationship. Id.; see also Trujillo v. Bd. of Cty. Comm’rs, 768 F.2d 1186, 1190 (10th Cir.1985).[5] In conducting the balancing required by the second prong, “the court will consider, among other things, the severity of the infringement on the protected relationship, the need for defendants’ conduct, and possible alternative courses of action.” Thomas, 765 F.3d at 1196.
The district court granted summary judgment in favor of the officers, finding the'familial-association claim was barred by qualified immunity. “[Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (internal quotation omitted). “When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must clear two hurdles to defeat the defendant’s motion.” Lundstrom v. Romero, 616 F.3d 1108, 1118 (10th Cir.2010). The plaintiff must then demonstrate that “(1) the defendant. violated a constitutional right, and (2) the right, was clearly established at the time of the alleged unlawful activity.” Id.
We agree with the district court that Cordova cannot meet either prong of the deprivation of familial-association test,- and thus cannot show a'violation of his constitutional rights. After the shooting, Cordova was taken in for emergency surgery, stabilized, and eventually transferred to a room. At that point, officers barred visitors from his hospital room until he was able to speak with police. Five days later, investigators were informed that Cordova was able to communicate and they attempted to obtain a statement. But at that time he asked to speak with an attorney. The officers immediately terminated the interview and the visitation restriction was lifted. The magistrate judge ultimately granted summary judgment on Cordo-va’s familial-association claim, finding that he could -not demonstrate the officers intended to interfere with a protected relationship.
Cordova has not presented any evidence demonstrating that the officers intended to interfere with his right to familial association. See Thomas, 765 F.3d at 1196. The visitation restriction was not aimed at any particular protected relationship or set of relationships—this was a temporary blanket prohibition on all visitors. Cordova argues that intent to interfere can be inferred from the lack of any legitimate government interest in barring visitors from his hospital room.
The officers claim- two- legitimate government objectives in response. First, they argue the visitation Restriction helped ensure that Cordova’s eventual statement was “uncontaminated by the thoughts and views of others.” Aple. Br. at 22. Second, they contend the restriction advanced the safety of officers and hospital personnel immediately following the shooting. Cor- *656 dova argues these justifications are pretex-tual.
We disagree that he raises a genuine issue of material fact as to the officers’ intent. As mentioned above, the argument is that a jury could infer intent to interfere with his relationships from the lack of legitimate reasons for barring visitors from his room.- The government, however, did-have-a legitimate interest in the restriction: it was attempting to obtain an untainted or uninfluenced statement concerning the shooting.[6] At this point, Cordova was being detained for the aggravated assault of three police officers. Ob-: taming an unbiased statement could substantially assist in the investigation of the case. Regardless of whether this justification is sufficient to satisfy the balancing test required under the second prong of the inquiry, this explanation shows the defendants’ actions were not directed “at the familial relationship.” Thomas, 765 F.3d at 1195-96. Rather, their actions were directed at obtaining the best statement possible from Cordova.
Nor has Cordova proffered any facts or theories that would allow a jury to find this justification was pretextual. He argues detectives could not have been very concerned with, getting uncontaminated statements because the officers involved in the shooting did not have similar restrictions placed on them. We fail to see the relevance of this point. Again, Cordova was in police custody for the aggravated assault, of three police officers, a crime for which he would eventually be charged. Detectives’ treatment of the officers in no way relates to the state’s interest in obtaining an uncontaminated statement from Cordova. Cf. Bell, 441 U.S. at 546, 99 5.Ct. 1861 (finding pretrial detainee “simply does not possess the full range of freedoms of an unincarcerated individual”). Furthermore, the undisputed facts in the summary judgment record support the notion that the point of the visitor restriction was to ensure a clean statement. It is uncontroverted that -detectives attempted to obtain a statement from Cordova as soon as he was able to communicate. When he declined, the visitation restriction was immediately lifted, showing that the restriction had not been “directed at” interfering, with Cordova’s familial-association rights, but rather at a legitimate investigative purpose.
We therefore find no error in the district court’s dismissal of the familial-association claim. Because Cordova could not demonstrate a constitutional violation, the officers were entitled to qualified immunity on this claim.

C. Right to a Preliminary Hearing

Cordova next argues the officers failed to timely return the arrest warrant to the state court as required by state law. He contends this delay amounted to a violation of his right to due process. The district court granted summary judgment in favor of the officers, concluding that any delay did not infringe on his procedural due process rights.
In assessing due process claims, our cases require us to ask two questions: “(1) whether the plaintiff has shown the deprivation of an interest in ‘life, liberty, or property’ and (2) whether the procedures followed by the government in depriving the plaintiff of that interest comported with ‘due process of law.’ ” Elliott v. Martinez, 675 F.3d 1241, 1244 (10th Cir.2012), Liberty interests can either *657 arise from the Constitution or be created by state law. See Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). But not all state laws create constitutionally protected liberty interests. We determine which statutes create liberty interests by looking to “the language of the statutes themselves.” Montero v. Meyer, 13 F.3d 1444, 1448 (10th Cir.1994). “Stated simply, ‘a State creates a protected liberty interest by placing substantive limitations on official discretion.’ ” Ky. Dep’t of Corr. v. Thompson, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (quoting Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983)).
Cordova points to a New Mexico law that requires the police to return arrest warrants to the issuing court immediately after an arrest is completed.[7] He claims one of the officers failed to comply with this requirement, and as a result, the legal process against him was delayed. More specifically, he argues circuit precedent-entitles him to a probable-cause hearing within forty-eight hours of arrest and that New Mexico law entitles him to a preliminary hearing within twelve days of arrest. Because he - received no hearings until twenty days after -the shooting, -Cordova argues that the officer’s failure to return the warrant deprived him of constitutionally required timely legal process.
We find no merit in these contentions. Cordova relies on our -recent precedent that an arrestee has a right to a probable-cause hearing -within forty-eight hours of arrest; Wilson v. Montano, 715 F.3d 847 (10th Cir.2013). But that case establishes no such requirement. As the Supreme Court made clear in Gerstein v. Pugh, 420 U.S. 103, 120, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), an arrestee has a constitutional right to a prompt probable cause determination, not to any particular kind of adversary hearing. Probable cause “can be determined reliably without an adversary hearing” and that standard, reason to believe the suspect has committed a crime, “traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof.” Id. Wilson is not to the contrary. At no point did we recognize a right to a hearing, as Cordova argues. Rather, we simply acknowledged the Supreme Court’s recognition'of the'right to a judicial determination of probable cause. See 715 F.3d at 852-53 (citing Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991); Gerstein, 420 U.S. at 114, 95 S.Ct. 854).
Here, a neutral magistrate judge determined there was probable cause to detain Cordova within a day of his arrest and signed a warrant for his arrest. Cordova has made no suggestion that this procedure was in conflict with the Supreme Court’s prior cases approving probable cause determinations made “by a magistrate in a nonadversary proceeding.” Gerstein, 420 U.S. at 120, 95 S.Ct. 854. Cordova received his probable cause determination, and the Constitution requires nothing else within forty-eight hours of arrest.
*658 We also are unpersuaded by Cordova’s contention that New Mexico law creates a liberty interest, constitutionally protected or otherwise, in a preliminary hearing within twelve days of arrest. In short, he argues that Rule 6-202(D) of the New Mexico Rules Annotated requires a preliminary hearing within ten days of the “initial hearing” and, under Wilson and Gerstein, the initial hearing must be within two days of arrest. He thus concludes that, state law establishes a right to a preliminary hearing within twelve days. As discussed above, however, neither Wilson nor Gerstein require any kind of hearing within two days of arrest—the initial hearing described in Rule 6-202(D) is an entirely different matter. In fact, New Mexico law sets no specific time limit .on initial appearances, requiring only that they be held “without unnecessary delay,” N.M. Stat. Ann. § 31-1-5(B). This standard allows for considerable discretion and thus cannot be the basis of a constitutionally protected liberty interest. See Ky. Dep’t of Corr., 490 U.S. at 461, 109 S.Ct. 1904.
Cordova has not identified any constitutionally protected liberty interests which could support his claim that he was deprived of timely legal process. As discussed above, an arrestee is not constitutionally entitled tó a probqble-cause hearing within forty-eight hours of arrest where a neutral magistrate has already made a probable cause determination. Nor does anything in New Mexico law establish a right to a preliminary hearing within twelve days of arrest. The district court did not err in dismissing this claim.

D. Transfer from, University of New Mexico Hospital

Cordova’s final constitutional claim is that one of the officers violated his due process rights by transferring him-from UNMH to a county jail’s medical facility after the hospital discharged him. He bases this on the state court’s bond order which contained a handwritten note stating, “D to remain in custody at UNMH-until further notice.” App. at 691. Cordo-va contends this created a constitutionally protected liberty interest in his remaining at UNMH.
The officer is entitled to qualified immunity on this claim. To establish a due process claim, a plaintiff must demonstrate the violation of a clearly established constitutional right. A right is clearly established “when, at the time of the challenged conduct, ‘[t]he contours of [a] right [are] sufficiently clear’ that every ‘reasonable official would have understood that what, he is doing violates that right.’ ” Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). “.Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.” Clark v. Wilson, 625 F.3d 686, 690 (10th Cir.2010) (quoting Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d 1150, 1155 (10th Cir.2010)).
First, the Supreme Court has never held thqt a state court custody order can create a constitutionally protected liberty interest in confinement at a particular facility. Even if such a right exists, it was not clearly established at the time of Cordova’s transfer. The bond order stated Cordova should remain at UNMH until further notice. It was not the officer who initiated Cordova’s removal from UNMH—the discharge order was issued by the hospital itself. The officer, moreover, had a legitimate interest in keeping Cordova in some *659 -form of custody based on the charges that had been filed against him.
' In sum, Cordova has pointed to no federal case that would have placed the officer on notice that he had to hold Cordova at UNMH, in contravention of the hospital’s discharge order. As a result, the district court did not err in granting qualified immunity on this claim.

E. Trial Errors and Jury Instructions

Cordova also lodges a series of challenges to the district court’s evidentiary rulings and jury instructions, which, he argues, together entitle, him to .a new trial or judgment as a matter of law on his excessive force claims. He claims five errors, which we consider in turn: (1) the district court improperly admitted evidence of events prior to the officers’ arrival that was irrelevant' to the reasonableness of the decision to use force; (2) counsel for the officers also (a) improperly introduced comparative negligence principles relating to the use of force; (b) encouraged members of the jury to empathize with the officers; (c) improperly disparaged Cordova’s claims and counsel; and (3) the jury instructions were legally erroneous because they failed to inform the jury that an officer’s use of force must be directed at an immediate threat and, where feasible, the officer must issue a warning before using deadly force.

1. Prior Events

Cordova first argues the district court improperly allowed so-called “hindsight” evidence—evidence of which the officers could not have been aware of at the time of the shooting and thus could not have affected the reasonableness of their decision to use force. In particular, he objects to the admission of evidence about Cordova’s behavior prior to the police encounter.
As an initial matter, it is unclear what evidence the district court -improperly allowed. Where ,a party objects to the admission of a class of evidence on a particular ground, (i.e. hearsay or relevance), he must identify the particular evidence at issue to be entitled to appellate review. See United States v. Thornburgh, 645 F.3d 1197, 1210 (10th Cir.2011).
In any event, the district court did not abuse its discretion in admitting evidence of events prior to the shooting. Contextual evidence can be admitted to help explain later events, especially where it might make one version of events more or less likely. See Boyd v. City and Cty. of San Francisco, 576 F.3d 938 (9th Cir. 2009). In Boyd, for example, the court allowed evidence of the plaintiffs actions and psychological state prior to a police encounter since it made the officer’s version of events—that the plaintiff had been the aggressor—more likely. Id. at 948-49. Similarly, both sides in this case contested the facts leading up to this shooting. Evidence of Cordova’s actions,or.mental state prior to the shooting could bolster the officers’ claim that he acted aggressively when they encountered him and. that, he raised his gun at them before they fired.
- In sum, the district court did not- err-in admitting evidence of' Cordova’s - actions prior to the shooting.

2. Comparative Negligence

Cordova next argues the officers improperly introduced irrelevant comparative negligence principles to the jury. “Comparative negligence is not applied,in suits for violations of federal constitutional rights.” Quezada v. Cty. of Bernalillo, 944 F.2d 710, 721 (10th Cir.1991).
Cordova claims several instances where comparative negligence was improperly introduced. First, one officer testified, *660 backed by an expert witness, that Cordova could have complied with police commands, but failed to do so. He also claims counsel compounded the error by relying on this testimony during closing arguments.
The statements were relevant and admissible. An individual’s failure to comply with an officer’s commands is relevant to determining the degree of threat posed by that individual. Thomson v. Salt Lake Cty., 584 F.3d 1304, 1314 (10th Cir.2009). The officer testified that he issued several commands to Cordova and that Cordova had the apparent ability to comply. This, in turn, bears on the objective reasonableness of an officer’s decision to use deadly force, and was thus relevant to the ultimate issue in the case.

3.Golden Rule

Cordova argues defense counsel improperly encouraged jurors to empathize with the officers by asking them to place themselves in the officers’ shoes at the time of the shooting. It is well established that a party may not exhort the jury to “place itself in a party’s shoes with respect to damages.” Shultz v. Rice, 809 F.2d 643, 651-52 (10th Cir.1986). But this so-called Golden Rulé argument “is not improper when urged on the issue of ultimate liability,” id. (quoting Stokes v. Delcambre, 710 F.2d 1120, 1128 (5th Cir. 1983)), especially where the issue is the objective reasonableness of the use of deadly force, see Sherrod v. Berry, 856 F.2d 802, 804-05 (7th Cir.1988) (“When a jury measures the objective reasonableness of an officer’s action, it must stand in his shoes and judge the reasonableness of his actions based upon the information he possessed....”).

4.Disparagement of Counsel and Claim

Next, Cordova argues that defense counsel- made an improper appeal to emotion in closing arguments. He contends the defense counsel implied to the jury that a verdict for Cordova would promote other lawsuits against officers, who have to make deadly force decisions, and that plaintiffs counsel did not have a good faith belief in some of the claims made to the jury.
These arguments are waived. Cordova did not object to the closing arguments at trial and does not argue for plain error review on appeal. See Richison v. Ernest Group, Inc., 634 F.3d 1123, 1131 (10th Cir.2011).

5.Jury Instructions

Finally, Cordova challenges one aspect of the jury instructions. . The district court’s instructions required Cordova to establish that the officers did not provide an adequate warning before deploying deadly force. The court instructed the jury that an officer’s command to “drop the weapon” is a sufficient warning in a situation where events are unfolding quickly. Cordova contends this instruction inadequately represents the proper legal standard.
“[J]ury instructions [are reviewed] as a whole and view[ed] in the context of the entire trial to determine if they ‘accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.’” United States v. Bedford, 536 F.3d 1148, 1152 (10th Cir.2008) (quoting United States v. Crockett, 435 F.3d 1305, 1314 (10th Cir. 2006)). We review the district court’s decision to give or to refuse a particular jury instruction for abuse of discretion. Id.
Where feasible, an officer is required to warn a suspect that hé is going to shoot before doing so. See Garner, 471 *661 U.S. at 11-12, 105 S.Ct. 1694. The district court did not abuse its discretion or misstate the law in instructing the jury that a command to “drop the weapon” is a- sufficient warning where events are unfolding quickly. The testimony at trial showed that one of the officers ordered Cordova to “drop the gun” before firing. Aple.App. at 27. This was a sufficient warning, given that events wére unfolding quickly and Cordova posed an active threat to the officers throughout the encounter. See Samuel v. City of Broken Arrow, 506 Fed.Appx. 751, 754 (10th Cir.2012) (noting this court has “treated orders to drop a weapon ... as sufficient warning when events were unfolding extremely quickly”.).
Cordova also contends that an instruction stating that officers may use force if “there was a threat of serious physical harm” was deficient for not limiting the use of force to immediate threats of serious physical harm. Reading the instructions as a whole, however, makes it clear that the jury was given an accurate explanation of the law. That same instruction told jurors to consider “whether the suspect posed an immediate threat” and whether he made any “hostile motions” towards the officers. App. at 1179. The instruction also said that a warning was required before shooting, when possible, and that an “order to drop a weapon is sufficient in cases where events 'are unfolding extremely quickly.” Id. Taken in context, the instruction clearly focuses the jury on the necessity of an immediate threat. We therefore find no error in the wording of this instruction.
In sum, we reject each of Cordova’s alleged errors and agree with the district court’s decisions denying his motion for judgment as a matter of law and his motion for a new trial.
III. Conclusion
For the reasons set forth above, the district court is AFFIRMED.

. In his reply brief, Cordova also challenged the dismissal of his municipal-liability claims against the City of Albuquerque. However, his attorney admitted at oral argument that he had waived this issue by failing to include it in his opening brief. See Reedy v. Werholtz, 660 F.3d 1270, 1274 (10th Cir.2011) (“[A] party waives issues and arguments raised for the first time in a reply brief.”).

. See, e.g., Miller v. Cuccia, 201 F.3d 431, 1999 WL 1070084, at *1 (2d Cir.1999) (unpublished) (lack'of probable cause for arrest); Aleman v. City of Bakersfield, 2013 WL 3936740, at *12 (E.D.Cal.2013) (warrantless search); Morgan v. Ramsey, 2013 WL 869046, at *7 (N.D.Okla.2013) (invalid warrant); Willis v. Mullins, 809 F.Supp.2d 1227, 1241 (E.D.Cal.2011) (warrantless search); El Ranchito, Inc. v. City of Harvey, 207 F.Supp.2d 814, 822-23 (N.D.Ill.2002) (warrantless search); Dobiecki, 829 F.Supp. at 235-36 (Miranda violation); Martinez v. City of Schenectady, 97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560, 564 (2001) (invalid warrant).

. See, e.g., Rhodes v. Mabus, 676 F.Supp. 755, 758-59 (S.D.Miss.1987) (prosecutor improp- - erly communicated with grand jurors); - Bearden v. BellSouth Telecomms., Inc., 29 So.3d 761, 766 (Miss.2010) (lack of jurisdiction); Parrish v. Marquis, 172 S.W.3d 526, 533 (Tenn.2005) (charges outside statute of limitations); Palmer Dev. Corp. v. Gordon, 723 A.2d 881, 884 (Me.1999) (charges outside statute of limitations); Brown v. Carr, 503 A.2d 1241, 1246 (D.C.1986) (failure to state a claim).

.See, e.g., Schlueter v. S. Energy Homes, Inc., 252 Fed.Appx. 7, 10-11 (6th. Cir.2007) (speedy trial dismissal not a favorable termination); Donahue v. Gavin, 280 F.3d 371, 384 (3d Cir.2002) (holding that a nolle prosequi does not indicate innocence'where “[t]he prosecutor simply reasoned that [the. plaintiff] was , not likely to receive any additional jail time if convicted in a retrial”); Brayshaw v. Garrett, No. 4:10CV272, 2011 WL 971147, at *8-9 (N.D.Fla. Jan. 16, 2011) (speedy trial dismissal); cf. Rich v. Baldwin, 133 Ill.App.3d 712, 88 Ill.Dec. 748, 479 N.E.2d 361, 364 (1985) (finding speedy trial violation constituted favorable termination, but tying holding to ‘‘prosecutor’s unexcused and unexplained failure to proceed to trial”); Parrish, 172 S.W.3d at 533 (action dismissed as outside statute of limitations was not favorably terminated); Palmer Dev. Corp., 723 A.2d at 884 (action dismissed as- outside statute of limitations was not favorably terminated).

. The officers contend we should analyze Cor-dova’s familial-association claim similarly to our cases addressing pretrial detention, relying on Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In Bell, a group of pretrial detainees argued that visitation restrictions violated their Fifth Amendment right to be free of punishment absent an adjudication of guilt. Id. at 530, 99 S.Ct. 1861. The Court rejected their claim, holding that a restriction on a pretrial detainee does, not constitute punishment unless it is (Contended as punishment or (2) unrelated to a legitimate government objective. Id. at 538, 99 S.Ct. 1861. Because Bell dealt with a different constitutional claim—the right to be free from punishment—we instead apply our normal familial-association analysis.

. Because, we agree with the government's first purported interest, we need not address the relationship between the prohibition on visitors and its interest in insuring the safety of officers and hospital personnel.

. Section 31-1^4 of the New Mexico.Statutes provides in part:
D. . It shall be the duty of the clerk of the district court to issue process in criminal cases filed in the district court. It shall be the duty of the clerk of the magistrate court or the magistrate, if there is no clerk, to issue process in criminal cases filed in the magistrate court. It shall be the duty of the law enforcement officer to whom process is directed to execute process and return the same to the clerk of the court from which process is issued or, if there is no clerk of the court, to the judge thereof. -