**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ESTATE OF MANUEL DIAZ;
GENEVIEVE HUIZAR, an individual,
          *Plaintiffs-Appellants*,

v.

CITY OF ANAHEIM, a California
municipal entity; NICK
BENNALLACK, Officer,
          *Defendants-Appellees.*

No. 14-55644

D.C. No.
8:12-cv-01897-
JVS-RNB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
James V. Selna, District Judge, Presiding

Argued and Submitted July 7, 2016
San Francisco, California

Filed August 24, 2016
Amended October 27, 2016

Before: Marsha S. Berzon and John B. Owens, Circuit
Judges, and Algenon L. Marbley,[*] District Judge.

Order;
Opinion by Judge Owens

---

[*] The Honorable Algenon L. Marbley, United States District Judge for
the Southern District of Ohio, sitting by designation.

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's judgment, entered following a jury trial in favor of defendants, in an action alleging that a City of Anaheim police officer used excessive force when he shot and killed Manuel Diaz.

The panel held that the district court erred by refusing to bifurcate the liability phase from the compensatory damages phase of the trial and as a result the district court admitted inflammatory evidence introduced by the defendants that had no relevance to the key issue in the case, whether defendant acted within the law when he shot Diaz.

The panel remanded for a new trial with guidance for the district court to: (1) closely review under Federal Rule of Evidence 401 and 403 evidence of Diaz's drug and gang affiliation and admit the evidence only to the degree that it was connected to the reaction of Diaz's mother to his death; (2) not permit expert testimony about gangs to be admitted if plaintiffs are willing to stipulate that Diaz was a gang member; (3) sufficiently consider that a limiting instruction may not sufficiently mitigate the prejudicial impact of certain evidence; and (4) when striking testimony, to clearly identify what testimony was improperly given, and instruct the jury that it may not be considered.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's denial of plaintiffs' motion for judgment as a matter of law on the excessive force claim, holding that this question was one for the jury. The panel noted that while plaintiffs presented substantial evidence that the force was unreasonable, defendants also presented substantial evidence to support their position.

## COUNSEL

Dale K. Galipo (argued) and Melanie T. Partow, Law Offices of Dale K. Galipo, Woodland Hills, California; Angel Carrazco, Jr., Carrazco Law, A.P.C., Tustin, California; Paul L. Hoffman, Schonbrun Desimone Seplow Harris & Hoffman, LLP, Venice, California; Humberto Guizar, Humberto Guizar Law Offices, Montebello, California; for Plaintiffs-Appellants.

Moses W. Johnson, IV (argued), Assistant City Attorney, Anaheim, California; Steven J. Rothans and Jill Williams, Carpenter, Rothans & Dumont, Los Angeles, California; for Defendants-Appellants.

Denise L. Rocawich, James R. Touchstone, and Martin J. Mayer, Jones & Mayer, Fullerton, California, for Amici Curiae California Police Chiefs' Association, California State Sheriffs' Association, and California Peace Officers' Association.

Steven J. Renick, Manning & Kass Ellrod Ramirez Trester LLP, Los Angeles, California, for Amicus Curiae International Municipal Lawyers Association.

## ORDER

The opinion filed on August 24, 2016, and reported at 2016 WL 4446114, is hereby amended. The superseding amended opinion will be filed concurrently with this order.

The panel has voted to deny the petition for panel rehearing. Judges Berzon and Owens voted to deny the petition for rehearing en banc, and Judge Marbley so recommends.

The full court has been advised of the suggestion for rehearing en banc, and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and rehearing en banc is **DENIED**.

No further petitions for panel rehearing or petitions for rehearing en banc will be entertained.

## OPINION

OWENS, Circuit Judge:

Anaheim Police Officer Nicholas Bennallack shot and killed Manuel Diaz during a mid-day encounter in July 2012. Diaz's estate and mother ("Plaintiffs") sued Officer Bennallack and the City of Anaheim ("Defendants") for federal civil rights violations and proceeded to a jury trial, but lost. Plaintiffs argue they should receive a new trial due to inflammatory evidence introduced by Defendants that had no

relevance to the key issue in the case—whether Officer Bennallack acted within the law when he shot Diaz. Because the district court abused its discretion in failing to bifurcate liability from compensatory damages—thus admitting this evidence at the liability phase of the trial—and the error was harmful, we reverse and remand.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Fatal Shooting of Manuel Diaz

While on routine patrol in gang territory the afternoon of July 21, 2012, Officers Bennallack and Heitmann drove their unmarked black Crown Victoria into an alley off of Anna Drive in Anaheim, California. They were not responding to a call or plea for help, though Bennallack had arrested a man for gun possession there two weeks prior.

In the alley, Bennallack saw Diaz and another man standing near a parked vehicle, with a third man inside. Bennallack neither recognized Diaz nor saw anything in his hands. But, Bennallack thought that criminal activity was afoot, and that Diaz was a gang member, based on his experience in the area and how Diaz was dressed.

Shortly after the officers drove into the alley, and before they said anything to Diaz, Diaz ran away. The officers pursued on foot. Officer Heitmann said he saw Diaz clutching an object near his waist before he took off, but Bennallack—the shooter—did not. While initially hoping to have a consensual conversation with Diaz, once the chase began Bennallack intended to arrest him for the misdemeanor offense of resisting, obstructing, or delaying a police officer.

As the officers chased Diaz, they could not see his hands. Based on how Diaz's arms were not "pumping" as expected and the outward position of his elbows, Bennallack claimed, he thought Diaz's hands were in his waistband. Another witness did not see Diaz put his hands at his waistband. Both officers said that Diaz looked back at them while he was running away, which they took as his attempt to "acquire a target."

The officers yelled commands such as "stop," "get on the ground," and "show me your hands," but Diaz kept running, and eventually went through a gate and into a courtyard. Bennallack was roughly five to ten feet behind Diaz during the chase. Bennallack testified that at one point, Diaz possibly could have exited through a gate to the street, but did not.[1] The officers took this as an escalation of danger, fearing that Diaz was hoping to lure them into an enclosed space to shoot them.

Diaz then slowed down. Witnesses disagreed about his movements at this point. Bennallack said Diaz turned to his left, while Heitmann said he turned to his right. One witness did not see him turn or make any threatening movements, while another saw Diaz turn in a non-threatening manner when the police told him to get on the ground.

As Diaz started to turn, Bennallack claimed to see a black cloth object going over a fence close to Diaz . Bennallack said that he believed Diaz had a gun in a "low-ready" position in front of his body, ready to fire. According to Bennallack, as Diaz turned and Bennallack saw the object in the air, he fired twice. When Bennallack shot Diaz, he could not see

---

[1] Bennallack did not recall whether that gate was open, closed, or ajar.

any part of his arms or hands.  The shots occurred within one to two seconds after Diaz started to slow down; Bennallack made no lethal force warning.  The first bullet entered Diaz's right buttock and was lodged in his left thigh.  The second bullet entered the right side of Diaz's head, just above and behind his right ear, and exited the left side of his head near his left ear.  Diaz was handcuffed and searched.  He died shortly thereafter at a nearby hospital.  Officers found a black cell phone and narcotics pipe nearby.  No firearm was recovered from the scene.

## B.  Pretrial Litigation

Diaz's estate and his mother, Genevieve Huizar, brought suit against the City of Anaheim and Officer Bennallack.**[2]** Huizar sought only non-economic damages, i.e., her loss of Diaz's love, companionship, comfort, care, assistance, protection, affection, society, and moral support.

A number of Plaintiffs' claims were disposed of by stipulation and the district court's partial grant of Defendants' motion for summary judgment.  By trial, Plaintiffs' remaining claims included three claims under 42 U.S.C. § 1983 (excessive force and unreasonable detention under the Fourth Amendment and unlawful interference with familial relations

---

**[2]** Plaintiffs filed suit in California Superior Court, and Defendants removed the action to the District Court for the Central District of California.

under the Fourteenth Amendment) and one claim for battery under California state law.[3]

### a. Motions In Limine

The parties filed a number of motions in limine, some of which are relevant on appeal.

**Gang Affiliation:** The district court ruled that evidence that Anna Drive was a known gang area was relevant to liability, but that Diaz's gang affiliation was relevant only to damages—the theory being that his gang membership undermined the strength of his mother's love for him and their relationship. The court excluded photographs of his gang tattoos, but noted it would revisit this issue if Diaz's mother testified with respect to damages that she had no knowledge of his gang affiliation.

**Photographs:** The court in principle agreed with Defendants that photographic evidence from Diaz's cell phone and Facebook page that Diaz possessed a weapon prior to the incident was relevant to the excessive force analysis under *Boyd v. City & County of San Francisco*, 576 F.3d 938, 943–44 (9th Cir. 2009). However, the court indicated it would likely exclude as irrelevant photos of gang activities and stacks of money.

**Drug Usage:** The court ruled that because Defendants did not offer evidence that Bennallack observed Diaz behaving erratically during the incident, toxicology evidence of

---

[3] During trial, Plaintiffs withdrew their Fourteenth Amendment claim. The district court refused to submit the unreasonable detention claim to the jury because it lacked sufficient evidence.

methamphetamine use was not relevant to § 1983 liability. Defendants also asserted that the toxicology evidence was relevant to damages, but the court's written order rejected this theory.

**Gang Expert:** The court permitted Daniel Gonzalez, a gang expert, to opine on Diaz's gang membership, but only as relevant to damages.  The court noted that his gang affiliation had limited relevance to the amount of damages, and any testimony should be brief.  The court also stated that if the parties agreed to stipulate to Diaz's gang membership, it would reconsider its decision to allow Gonzalez to testify. The court specifically excluded as unduly prejudicial testimony about gang activities in general; that Anna Drive was part of the gang's turf (as Bennallack would testify to this and it was undisputed); and any of Diaz's specific gang activities.

### b.  Motion To Bifurcate

Plaintiffs also moved to bifurcate the liability phase from the damages phase of the trial, to avoid the risk that prejudicial information unknown to Officer Bennallack at the time of the shooting—such as Diaz's gang membership, related photos, and drug usage—would taint the jury's consideration of Bennallack's use of deadly force.  The district court granted this motion in part, severing punitive damages from liability and compensatory damages.  The district court briefly explained that neither prejudice nor the complexity of the issues warranted bifurcating liability from compensatory damages, and that limiting instructions would cure any potential prejudice.  The record is unclear as to why the court bifurcated punitive damages but not compensatory damages.

### c.  Trial

After a six-day trial, the jury deliberated for less than two hours before returning a verdict that Officer Bennallack did not use excessive or unreasonable force.[4]  However, during trial—and over Plaintiffs' repeated objections—the district court's evidentiary rulings strayed from its pretrial rulings. As a result, the jury was exposed to a copious amount of inflammatory and prejudicial evidence with little (if any) relevance.

### i.  Improper Evidence of Diaz's Gang Membership

The most troubling evidence admitted at trial related to Diaz's gang membership.  There was wide-ranging testimony from Defendants' gang expert, Gonzalez.  There were also photographs featuring Diaz's tattoos and him posing with guns and throwing gang signs, none of which Bennallack knew about or had seen when he shot Diaz.

In ruling on the motions in limine, the district court held that evidence of Diaz's gang affiliation was relevant only to damages, because Officer Bennallack did not know he was a gang member.  The court also specifically excluded evidence of Diaz's gang tattoos themselves, such as photographs, because such evidence was unnecessary to establish the fact that he was a gang member.  The court later recognized generally that "[p]hotographs have the potential for both relevant evidence and gratuitous provocation of the jury."

---

[4] The parties agreed that the jury finding regarding excessive force would also be dispositive of the state battery claim.

Further, before trial the court had warned that if Diaz's mother testified she had no knowledge of his gang affiliation, the court would revisit its ruling on the admissibility of evidence of Diaz's tattoos. The court also noted that if Plaintiffs stipulated that Diaz was a gang member, it would reconsider its decision regarding the testimony of the gang expert. At trial, Diaz's mother was somewhat equivocal as to whether she knew her son was a gang member.[5] Though Plaintiffs then offered to stipulate to his gang membership, the district court ultimately permitted the gang expert to testify, explaining that:

> Given [Diaz's mother's] testimony, I think [the defense is] entitled to put the gang expert on. It has got to be narrow and it's got to be focused on his gang membership, not the activities of the gang at large. I don't think the plaintiff at this time is entitled to basically

---

[5] She testified as follows:

Q:  Do you acknowledge that your son was a member of the East Side Anaheim street gang?

A:  I have come to find out more after his death. I loved my son, and maybe I didn't know a lot about him during those times. It doesn't mean I didn't love him any less.

Q:  No one is disputing that, Ms. Huizar. Are you indicating you did not know at that time that he was a member of the East Side Anaheim street gang?

A:  I'm not sure how to answer because I never thought of him as a gang member.

rehabilitate the testimony and rewrite the record.

The court then ruled that Defendants could offer photographs of Diaz's gang tattoos and him throwing gang signs, as well as other information related to his gang moniker, clothing, and association. When Plaintiffs' counsel questioned the court's change of heart regarding the admission of the tattoo photographs—which it had initially excluded—the court remarked, "[w]ell, I think they're entitled to put in probative evidence. She hasn't straight up admitted that he was a gang member. I don't think the tattoos are inflammatory. They are what they are." In contrast, the court excluded discussion of specific gang activities, and any additional photographs of Diaz with guns, as some already had been admitted as to liability under a "gang gun" theory.[6] But Defendants again were permitted to present the previously admitted gun photographs to the jury—in one, Diaz held a gun in his left hand and made a gang sign with his right. In another, he pointed a gun to his head.

---

[6] Defendants' explanation for why no firearm was found at the scene was that Diaz was armed with a shared "gang gun" that a fellow gang member retrieved and removed after the shooting. As such, the court admitted photographs of Diaz posing with guns two days before the shooting, ostensibly under the auspices of *Boyd*. *See* 576 F.3d at 944 ("In a case such as this, where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible."). As Officer Bennallack never saw a gun, we have reservations about the admissibility of this evidence even as to liability. But we need not reach this question, as Plaintiffs have not meaningfully raised the issue on appeal and we reverse on bifurcation grounds.

The testimony of gang expert Gonzalez was highly prejudicial—so much so that the court gave the jury an early limiting instruction soon after he testified.  Before giving the instruction, the district court stated in a sidebar that:

> Unquestionably this gang evidence at least to his gang membership is inflammatory, and frankly the witness made it a point to expand his answers on every question.  Most answers were beyond the scope of the question.  Some objections were made which I sustained; some weren't.

The district court rightly pointed out Gonzalez's testimony was both inflammatory and beyond the scope permitted by the court—as were some of the questions defense counsel posed.[7]

For example, when asked "Why do gang members pose with guns?" Gonzalez responded: "It goes into their image, their persona of being a gang member, showing other gang members that they have firearms readily accessible, that they have means to commit crimes against the general public, *against law enforcement*, against rival gang members." (emphasis added).  When asked "Why do gang members wear baggy T-shirts?" he responded in part: "Another reason that I have come to learn about is that it helps conceal items like firearms, other deadly weapons.  It's easier to put a rifle or a

---

[7] Several questions were so irrelevant to establishing gang membership or the gang gun theory that the district court sustained Plaintiffs' objections before Gonzalez could answer.  For example, defense counsel asked, "why do gang members post their photographs on Facebook?" and "what's the significance of gang members associating with one another?"

sawed-off shotgun down your shorts or your pants when you've got baggy pants on and a baggy shirt." Gonzalez also was permitted to testify to several things which the court originally had excluded as unduly prejudicial under Rule 403 during the motions in limine, including that Anna Drive was part of the gang's turf and gang activities in general. He further testified about Diaz's gang moniker—"Stomper"— and then repeatedly used the moniker to refer to Diaz. The jury also learned that Gonzalez personally had arrested Diaz on a prior occasion.

Some of Gonzalez's testimony was formally "stricken" from the record. The following pattern arose: after improper testimony, Plaintiffs' counsel would move to strike the testimony and the district court would state "stricken" or "the last part of the answer will be stricken." During one stretch, this pattern occurred on five different occasions in seven minutes. Gonzalez was neither warned nor reprimanded, save for the district court directing him at the very end of his testimony to "[p]lease just answer the questions asked."

In summary, Gonzalez's testimony did not hew to the district court's direction to be "narrow" and "focused on his gang membership, not the activities of the gang at large." Instead, Gonzalez took every opportunity to opine on matters squarely forbidden by the court's previous rulings. As a result, the jury was exposed to inflammatory testimony that was wholly irrelevant to liability, and of limited relevance even as to damages.

### ii. Improper Evidence of Diaz's Drug Use

Further, despite its original hesitation, the district court ultimately ruled that the toxicology evidence was relevant to

damages,[8] and Defendants proceeded to similarly stretch this ruling. In contrast, the court found that the toxicology evidence was not relevant to § 1983 liability, as Officer Bennallack did not know or suspect that Diaz was under the influence of drugs at the time of the incident.

But beyond any marginal relevance of Diaz's drug use to damages—again, because it supposedly undermined his mother's claim that she loved her son—the evidence at trial fixated on his drug use on the day of the incident and how it may have affected his behavior, which had *no* relevance to his mother's loss. Indeed, the singular focus of the drug-use testimony was Diaz's toxicological status on the day he was shot, a risk which the district court recognized when it first ruled on the issue pretrial. At the time, the court "reject[ed] the contention that drug intoxication on the date of the incident goes to damages. At most, it establishes his condition on just one day. Any further inference would be unsupported and unduly prejudicial."

To this end, Defendants' toxicology expert, Dr. Clark, discussed the high levels of methamphetamine in Diaz's blood when he died, and opined that he was intoxicated when he was shot:

> Those levels—actually there are some people
> who die with levels that high, but not in this

---

[8] The timing and rationale underlying the court's final ruling is not evident from the record on appeal. Defendants had argued that Diaz's drug use was relevant to Ms. Huizar's claim for the loss of her relationship with her son, particularly in light of her testimony that Diaz was often not permitted to live with her and her husband in part because he did not follow their rule banning drug use.

> case. And those levels are actually quite high as far as what we would think of as recreational use of methamphetamine. But those levels are high enough since we aren't certain of his tolerance to the drug that we can say he was without a doubt under the influence at the time of his death[.]

Dr. Clark also described the behavioral effects of methamphetamine use and how it may have affected Diaz's behavior on July 21:

> We know methamphetamines can be dangerous, and we know it affects people different ways. It can cause euphoria. It can cause hallucinations. It can cause people to become paranoid, can cause them to become violent; and it can cause them to use poor judgment. That's pretty much common knowledge.
>
> From my review of the facts in this case, it's possible that methamphetamine at the levels of which were measured at autopsy could have caused Mr. Diaz to use poor judgment in what ended up happening in this case.

While the court granted Plaintiffs' motion to strike the second part of the response as lacking medical probability, the jury already had been exposed to this testimony. This was also the second time a defense expert improperly speculated as to how drug use may have affected Diaz's judgment the day of the shooting. Even after his earlier testimony was "stricken," Dr. Clark continued to focus on the day of the incident. He

testified that Diaz had likely ingested methamphetamine within six hours of the shooting, and concluded "to a reasonable medical probability" that "[Diaz] was under the influence of methamphetamine at the time [of the shooting]."

## II. DISCUSSION

### A. The Trial Court Erred in Failing To Bifurcate Liability from Compensatory Damages

Judges have wide latitude in conducting their trials, and for good reason. *See, e.g.*, *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). This is why the rules permit bifurcation, and why we usually affirm a trial judge's decision—to either bifurcate or keep things together—as within her discretion. But this discretion is not limitless.

### a. Standard of Review

We review for abuse of discretion the district court's rulings on whether to bifurcate a trial. *Exxon Co. v. Sofec, Inc.*, 54 F.3d 570, 575 (9th Cir. 1995). Under this standard, we reverse only when we are "convinced firmly that the reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000).

Federal Rule of Civil Procedure 42(b) permits a court to order a separate trial of separate claims or issues "[f]or convenience, to avoid prejudice, or to expedite and economize." A court might bifurcate a trial to "avoid[] a difficult question by first dealing with an easier, dispositive issue," *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 961 (9th Cir. 2001), or to avoid the risk of prejudice. *See Quintanilla*

*v. City of Downey*, 84 F.3d 353, 356 (9th Cir. 1996) (explaining that, in a § 1983 case challenging the use of a police dog during a search, the trial court bifurcated the trial of the individual officers from that of the city in part to avoid prejudice). Further, "[i]t is clear that Rule 42(b) gives courts the authority to separate trials into liability and damage phases." *De Anda v. City of Long Beach*, 7 F.3d 1418, 1421 (9th Cir. 1993); *see also* 9A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2390 (3d ed. 2016) ("The separation of issues of liability from those relating to damages is an obvious use for Federal Rule 42(b).").

### b.  Discussion

Here, under the guise of impeaching Huizar's testimony that she loved her son, Defendants introduced (over repeated objection) photographs of Diaz posing with firearms and making gang signs.  Then Gonzalez expounded on the activities and customs of violent gangs and described Diaz's moniker of "Stomper," his criminal history, and his tattoos in great detail.  Dr. Clark speculated as to how the enormously high level of methamphetamine in Diaz's system at the time of the shooting may have affected his response to the police. It is hard to see how most of this testimony was relevant even to damages, absent testimony—of which there was none— that Ms. Huizar knew of the photographs, gang signs, and drug use on the day of the offense, and that that knowledge undermined the emotional impact of her son's death.  And there was also highly prejudicial testimony that was under any circumstances not relevant to liability *or* damages.  For example, Gonzalez stated that gang members require access to firearms to "use them in self-defense . . . against police

officers" and pose with firearms publicly to show "that they have means to commit crimes . . . against law enforcement."[9]

This was simply overkill. Considering that the parties and district court had repeated trouble tracking precisely why this prejudicial evidence was admissible for any purpose, no jury could properly compartmentalize it. For example, on the fourth day of trial, the court and parties were still not clear about whether the fact that Diaz was under the influence of drugs was relevant to liability under a comparative fault defense, even after Plaintiffs had dropped their negligence claim.[10] Even assuming that a portion of this evidence had some relevance to damages, it never should have been combined with the liability phase.

Indeed, this court has recognized time and time again that gang evidence has the potential to be particularly prejudicial. *See, e.g.*, *Kennedy v. Lockyer*, 379 F.3d 1041, 1055 (9th Cir. 2004) ("Our cases make it clear that evidence relating to gang involvement will almost always be prejudicial[.]"); *United States v. Takahashi*, 205 F.3d 1161, 1165 (9th Cir. 2000) (holding the district court did not abuse its discretion in admitting evidence of gang membership where the court

---

[9] This testimony was ostensibly "stricken" from the record as described above.

[10] Prior to Dr. Clark's testimony—and outside the presence of the jury—Plaintiffs' counsel inquired as to the relevance of his testimony, in light of the fact that they had dropped the negligence claim. Defendants argued that the toxicology evidence went not only to damages but also to liability (as relevant to a comparative fault defense), and the court remarked that "[w]e need to sort that issue out." No further discussion occurred before Dr. Clark testified, though the court ultimately gave a limiting instruction that Diaz's drug use was relevant only to damages.

"recognized the need to prevent undue prejudice," gave a limiting instruction, excluded photographs of gang tattoos as evidence of membership, and minimized repetition of the gang's name).

Similarly, even if evidence of Diaz's drug use were relevant to damages, the form and nature of the evidence presented regarding his drug use on the day of the incident was unduly prejudicial in light of the decision not to bifurcate. It would have been far more relevant to damages for an expert to testify simply to the presence of drugs in Diaz's body and to the effects of drug use on relationships. The focus on the day of the incident was minimally probative of damages, and was highly likely to influence improperly the jury's evaluation of Officer Bennallack's use of force, when he never suggested he thought Diaz may have been intoxicated.[11]

Further, the district court already had bifurcated punitive damages. Bifurcating from the liability phase the testimony actually relevant to compensatory damages would have cost

---

[11] In urging *en banc* review, amici curiae California Police Chiefs' Association et al. argue that our decision conflicts with *Boyd*, which upheld a district court's decision to admit drug usage evidence to corroborate the police officers' testimony that the decedent was acting erratically. *Boyd*, 576 F.3d at 943–45. Yet here, the district court exercised its discretion and prohibited the introduction of Diaz's drug use for liability purposes because there was no evidence that Diaz was acting erratically. *See supra* at 9. Diaz's drug usage was only admissible to undermine any damages award. *See supra* at 14–17. The officers did not appeal that ruling, and do not cite *Boyd* as an alternative means to affirm the judgment. Simply put, the *Boyd* argument that amici now raise is not an issue in this appeal.

little, if any, court time—none, if the jury had returned a defense verdict.

Because the district court abused its discretion in refusing to bifurcate the compensatory damages phase (thereby allowing in this unduly prejudicial evidence of drugs and gangs), we reverse. Under these circumstances, the court's bifurcation ruling was "beyond the pale of reasonable justification under the circumstances." *Apfel*, 211 F.3d at 1175. To be clear, we are not announcing a rule that requires district courts always, usually, or frequently to bifurcate damages from liability. District courts still have the broad discretion to make these decisions. But where, as here, graphic and prejudicial evidence about the victim has little, and in large part no, relevance to the liability issue, district courts should bifurcate to avoid situations like the one before us.[12]

In light of our decision to reverse the judgment and remand for a new trial, we also provide some guidance to the district court.

---

[12] In light of our ruling, we do not reach the issue of whether Plaintiffs' failure to make a Rule 50(a) motion as to the unlawful detention claim barred review of the district court's dismissal of that claim *sua sponte* before the close of evidence. We do observe, however, that requiring a litigant to make a Rule 50(a) motion for judgment as a matter of law on a claim no longer before the jury appears, at first blush, futile. *See Velazquez v. City of Long Beach*, 793 F.3d 1010, 1018 (9th Cir. 2015) ("A motion for judgment as a matter of law may be granted if 'the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]'" (quoting Fed. R. Civ. P. 50(a))). We also do not reach whether Plaintiffs are entitled to a new trial under Rule 59(a) based on the district court's evidentiary rulings or formulation of jury instructions.

First, the evidence of Diaz's drug use and gang affiliation has marginal, if any, probative value as to damages, and none as to liability. On retrial, the district court should closely review this evidence under Federal Rules of Evidence 401 and 403, and should assure that such evidence is admitted only to the degree that the testimony is connected up with Ms. Huizar's reaction to her son's death.

Second, if Plaintiffs are willing to stipulate that Diaz was a gang member (which they claim they tried to do during trial), no expert testimony about gangs—such as gang activities, tattoos, or monikers—should be admitted. Bennallack can certainly testify as to his knowledge about gang activity in the area. *See Graham v. Connor*, 490 U.S. 386, 397 (1989) (holding that to determine whether police force is excessive, the proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them").

Third, while there is a "strong presumption that jurors follow instructions," a limiting instruction may not sufficiently mitigate the prejudicial impact of evidence in all cases. *See Miller v. City of Los Angeles*, 661 F.3d 1024, 1030 (9th Cir. 2011); *Bayramoglu v. Estelle*, 806 F.2d 880, 888 (9th Cir. 1986) ("A timely instruction from the judge usually cures the prejudicial impact of evidence unless it is highly prejudicial or the instruction is clearly inadequate." (quoting *United States v. Berry*, 627 F.2d 193, 198 (9th Cir. 1980))). The Advisory Committee Note to Federal Rule of Evidence 403 also recognizes the potential inadequacies of a limiting instruction, counseling that "[i]n reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction." And if a limiting

instruction was considered sufficient to cure all prejudice, there would be no need ever to bifurcate to avoid prejudice in other cases; yet in the civil rights context, courts often bifurcate the trials of individual officers from municipalities to avoid such prejudice. *See, e.g.*, *Quintanilla*, 84 F.3d at 356 ("The district court . . . in the interest not only of convenience and judicial economy but also the avoidance of potential prejudice and confusion, bifurcated the trial of the individual police officers from the Chief and city."); *Green v. Baca*, 226 F.R.D. 624, 633 (C.D. Cal. 2005) ("Bifurcation is appropriate . . . to protect the individual officer defendants from the prejudice that might result if a jury heard evidence regarding the municipal defendant's allegedly unconstitutional policies.").

And fourth, if the district court is going to sustain an objection and grant a motion to strike, merely saying "stricken" does not sufficiently inform the jury about the proper use of the evidence it just heard. When striking testimony, the court should clearly identify what testimony was improperly given, and should instruct the jury that it may not be considered. It should also use a sidebar or brief recess to warn the witnesses and attorneys that further attempts to push the envelope could lead to greater sanctions, such as exclusion of testimony or a negative instruction.[13] After all,

---

[13] *See, e.g.*, *Barnett v. Norman*, 782 F.3d 417, 422–23 (9th Cir. 2015) (outlining powers of district judge to ensure witness complies with court order); *United States v. Panza*, 612 F.2d 432, 439 (9th Cir. 1979) ("We can only speculate as to the effect on the jury of the striking of the testimony." (citing *United States v. Cardillo*, 316 F.2d 606, 612 n.3 (2d Cir. 1963)); *Cardillo*, 316 F.2d at 612 n.3 ("The effectiveness of such procedures after the testimony has been heard by the jury has been the subject of speculation, metaphysical and otherwise, by jurists and trial lawyers for generations.").

lawyers and witnesses, like misbehaving children or rattled basketball players, sometimes need a timeout.[14]

## B. The Trial Court Did Not Err in Ruling Force Was Not Excessive as a Matter of Law

Plaintiffs also appeal the district court's denial of their motion for judgment as a matter of law on their excessive force claim. Because the district court correctly ruled that this question was one for the jury, we affirm its denial of Plaintiffs' motion.

### a. Standard Of Review

"We review de novo the district court's denial of a Rule 50(b) renewed motion for judgment as a matter of law. The test is whether 'the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.'" *White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002), *amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003) (footnote omitted) (quoting *Forrett v. Richardson*, 112 F.3d 416, 419 (9th Cir. 1997)). We "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Where an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most

---

[14] *Cf. United States v. McKoy*, 771 F.2d 1207, 1213 (9th Cir. 1985) ("We have often noted that the trial court may be able to 'neutralize' the effect of improper prosecutorial remarks by admonishing counsel to refrain from such remarks or by giving appropriate curative instructions to the jury.").

properly characterized as one invoking the protections of the Fourth Amendment." *Graham*, 490 U.S. at 394. As with other Fourth Amendment claims, we inquire "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

We determine whether challenged state actions are objectively reasonable by balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). This demands a "fact-intensive inquiry requiring attention to all circumstances pertinent to the need for the force used." *Velazquez*, 793 F.3d at 1024. We "first consider[] the nature and quality of the alleged intrusion; we then consider the governmental interests at stake by looking at (1) how severe the crime at issue is, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1279–80 (9th Cir. 2001)). These factors are not exclusive. *Id.*

### b. Discussion

Here, while Plaintiffs presented substantial evidence that the force was unreasonable, Defendants also presented substantial evidence to support their position. When each of the *Graham* factors is analyzed, the record does not "permit[] only one reasonable conclusion . . . contrary to that of the jury." *White*, 312 F.3d at 1010 (citation omitted).

### i. Severity of the Crime or Other Circumstances to Which the Officers Were Responding

It is undisputed that the only crime Diaz had committed, if any, was a misdemeanor, and that Officer Bennallack had no information that a crime was reported in the area. However, Bennallack was aware of an ongoing criminal investigation in the area involving the sale and possession of firearms by the East Side Anaheim Gang, and believed Diaz to be a gang member.

### ii. Immediate Threat To Officer Safety

While Officer Bennallack testified that he never saw Diaz's hands, or a weapon on his person, certain indicia could have led a reasonable officer to believe Diaz was armed. For example, Bennallack observed that rather than pumping his arms as he ran, Diaz was "reaching towards his waistband" and appeared to be manipulating an object with his hands. Bennallack also testified that Diaz looked back at the officers multiple times, as if to acquire a target. Finally, instead of running through a gate that led to the street, Diaz led the officers into a fenced-in area, and Bennallack observed Diaz begin to slow down, assume a "low-ready" position, and turn towards him.

On the other hand, in addition to the fact that Bennallack never saw Diaz's hands or a weapon on his person, other evidence weighs against an immediate threat to officer safety. For example, Diaz was shot in the back, which could refute Bennallack's testimony that he was turning. While the jury was entitled to weigh this evidence and Bennallack's credibility against other evidence and the credibility of

witnesses who offered alternative versions of events, we must view the evidence in the light most favorable to Defendants.

Certainly "a simple statement by an officer that he fears for his safety or the safety of others is not enough." *Deorle*, 272 F.3d at 1281. Nevertheless, Defendants presented facts demonstrating why such fear could have been reasonable here, including observations of Diaz's movements, flight route, the presence of gang activity in the area, and his refusal to comply with the officers' orders. *Cf. id.* (explaining that the officer using force knew the plaintiff "had discarded his crossbow following [the officer's] instructions to do so, and carried only a bottle or a can with him at the time he was shot"). Even if Bennallack's subjective fear is discounted, much of his testimony focused on observations during the encounter and how he interpreted the situation based on his training, which the jury could reasonably credit.

### iii. Attempting To Evade Arrest by Flight

It is undisputed that Diaz was running from the officers and did not obey their commands to stop, put his hands up, or get on the ground. That Diaz was slowing down at the time of the shooting does not compel the conclusion that he was complying with the officers' orders, nor does it prove that he was preparing to shoot the officers. These are both reasonable interpretations of the evidence. The jury was entitled to choose between them based on their weighing of the evidence and the witnesses' credibility.

In sum, taking the evidence in the light most favorable to Defendants, these facts do not warrant judgment for Plaintiffs as a matter of law.

### III.    CONCLUSION

Police shootings are often the most difficult—and divisive—cases that our legal system and society encounter. Wrapped in strong emotion and often opaque case law, they can perplex even our most experienced trial judges, like the judge in this case. To avoid the runaway case—like this one, where the Defendants and their witnesses repeatedly overstepped the judge's rulings—courts should use bifurcation to corral lawyers and witnesses, so the jury hears only evidence relevant to the issues at hand. Here, that was whether Officer Bennallack acted lawfully when he shot Diaz. Because the jury heard considerable and inflammatory evidence that had nothing to do with that question, we **REVERSE** and **REMAND** this case for a new trial.