Filed 3/2/21  P. v. Nunn CA3
See concurring & dissenting opinion

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>     v.<br><br>JOSEPH ARTHUR NUNN,<br><br>      Defendant and Appellant. | C083695<br><br>(Super. Ct. No. 62125182) |

Defendant Joseph Arthur Nunn did not get along with his housemate Kevin Spindler.  During an argument, defendant retrieved his handgun from his bedroom and then shot and killed Spindler.

Following a jury trial, defendant was convicted of second degree murder (Pen. Code, § 187, subd. (a))[1] with allegations for personally using a firearm and personally

---

[1]     Undesignated statutory references are to the Penal Code.

1

using and discharging a firearm while causing death (§§ 12022.5, subd. (a)(1), 12022.53, subd. (d)) and was sentenced to 40 years to life in state prison.

He contends on appeal that there was insufficient evidence of a lack of provocation and heat of passion, self-defense, and imperfect self-defense to support his murder conviction. He further contends the trial court violated his due process right to present a defense by excluding expert testimony regarding subject precipitation, and the matter should be remanded to allow the trial court to exercise its discretion over whether to strike the firearm enhancements. He contends in a supplemental brief that the matter should be remanded pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) for a hearing on his ability to pay the restitution fine, and court operations and conviction assessments. Defendant's insufficient evidence claim is improperly premised on us accepting the defense evidence rather than the evidence submitted by the prosecution, which supports the murder conviction. Exclusion of this portion of the expert testimony was a proper exercise of the trial court's discretion under Evidence Code section 352 and did not deprive defendant of the right to present a defense. We decline defendant's invitation to follow *Dueñas*. Since changes to section 12022.5 and 12022.53 giving the trial court discretion to strike the enhancement in the interests of justice apply retroactively to cases not final on appeal, we shall remand for the court to determine whether to exercise its discretion to strike the enhancements and otherwise affirm.

BACKGROUND

*Prosecution Case*

Defendant rented a home in Roseville from his sister. As of September 2013, he had been subletting a room to Spindler for about six months.

At about 3:00 p.m. on September 30, 2013, Spindler called 911 to report defendant had discharged a pistol and then went back into the house. After Spindler next told the dispatcher defendant was walking around outside with a gun, he asked the dispatcher to send an officer. He next said, "Come on, you gonna do something punk? I'm not scared

2

of you motherfucker." Spindler continued, "I not fucking scared, shoot me fucker"; after shots were fired, he said, "Fucking shot me. God damn it he fucking shot me. Fucking shot me." There were no more responses to the dispatcher after the shots.

Sometime after 3:00 p.m., neighbors heard a single gunshot followed by more shots 30 seconds or so later. Earlier that day, Rex Archer was in his backyard nearby when he heard a male voice who was emotionally worked up making loud, grunting noises and singing to rock music. It sounded like a tantrum. Archer later heard arguing and gunshots, and someone on the phone to 911. He heard someone say, "shoot me, Motherfucker," and name calling. This sounded like the same person who earlier made the grunting noises. After a series of shots, there was silence.

Sophoronia Bruno looked out of her window after hearing the first shot. Spindler was in the yard and appeared uninjured. He appeared to be having a conversation with someone. Spindler eventually walked out of her sight.

After hearing the gunshots, neighbors ran to defendant's front yard, where they found Spindler lying on the ground. Police were dispatched at around 3:15 p.m. They found Spindler lying face up on the grass, shirtless, and wearing boxer shorts with a sandal on his left foot. A cell phone was about two feet from his body. No weapon was on or near him.

Defendant was ordered out of the house; he came out and told the officers the gun was on the kitchen table. He was shaking, crying, and upset as he was handcuffed and placed in the back of the patrol car. An almost hysterical defendant said he could not believe he had shot someone and wished he had not done it.

Defendant talked to the police again about 10 to 15 minutes later, after calming down. He said that he and Spindler did not get along, with a major reoccurring issue being his housemate's dislike of those who used profanity. Defendant's friend Tom Hart would often come to the house and frequently used profanity. Hart visited the house that day and he and defendant swore, causing Spindler to become very upset, which led to a

3

very heated argument.  Defendant said he did not know why he chose to use the gun, and repeatedly expressed disbelief that he shot Spindler.  Defendant never mentioned being attacked, feeling threatened, or acting in self-defense.  He said, "I can't believe I did something that stupid."  Also, he said, "Why didn't I just walk away?  Why did I have to shoot him?"

Defendant said he tried to do the right thing until the day of the shooting.  He said, "Smart and brave people don't have the blood of another human being on their freaking hands."  He exclaimed that he shamed his family, and that "some people belong behind bars and I'm seriously suspecting I'm one of them."  He also said that he had to do his time.

After stating he wanted a lawyer, defendant made several spontaneous statements.  Defendant said it was self-defense but he could have walked away.  Apparently talking to himself, defendant said he gave Spindler a 30-day notice and could have just taken the beating.  He asked himself why he did not call the police.  Defendant also said Spindler needed to go and God had to have him do it.  He claimed Spindler came at him twice.

Four shell casings were found in the area.  Spindler died of gunshot wounds to the chest.  He was at least a few feet away from defendant when he was shot, and died within a few minutes after being shot.

*The Defense*

Defendant testified that he shot Spindler out of fear for his life.  Spindler was coming right at defendant when he was shot.

Defendant's problems with Spindler started when Spindler was moving into the house.  Defendant banged Spindler's bicycle into a chest of drawers during the move, which caused Spindler to be upset with him.  Spindler was obsessed and upset with a former roommate of his.  Defendant thought Spindler was using marijuana every day but did not bring the matter up with him.

4

Defendant thought Spindler was mentally unstable. He found it odd that Spindler talked to himself. Spindler had said he would kill the person who had stolen his backpack. Knowing that Spindler was unstable, very obsessive, and had no problems talking about violence, defendant nonetheless did not ask Spindler to leave. Defendant finally decided to consider Spindler leaving on September 18, 2013, when he determined that if Spindler bit his head off for something three more times, he would ask him to leave.

On September 24, 2013, Spindler blew up at defendant and demanded he clean up paint chips defendant had scraped from Spindler's window. A day or two later, he yelled and swore profusely to a neighbor that the neighbor had to move right now. On September 28, when defendant asked Spindler to turn down his stereo, Spindler replied that he was lucky he asked nicely.

On the day of the shooting, Hart came by the house and swore repeatedly. This upset Spindler, who came out from the garage, told Hart to stop, and returned to the garage. Hart continued swearing after Spindler left, which led Spindler to walk out of the garage and yell that he was sick of the swearing.

Spindler told defendant he was sick of him bringing people over to the house and sick of Hart's swearing. Calling defendant and Hart assholes, Spindler said he was not going to put up with it anymore. As Hart started to leave, Spindler held a rake and told Hart that he would kick Hart's ass if he returned. Spindler then started to swear at defendant. After a five-minute tirade, Spindler turned away from defendant, walking in circles in the front yard on the other side of the fence, cursing at defendant.

Staying in the patio area, defendant thought it would be dangerous to give Spindler a 30-day notice at that time. He waited an hour and then gave notice to Spindler after he appeared to have calmed down. Spindler called him a liar, swore at him again, and threatened to sue him.

5

Afraid that Spindler would come at him, defendant backed off. He went back into the house after Spindler came towards him and started walking in circles. He thought about leaving in one of his two vehicles, but his truck had a broken taillight and his car's battery was dead. Spindler yelled at him for locking him out of the garage. Defendant told Spindler he had lost his garage privileges, but agreed to open the garage after Spindler came towards him and told defendant to open the garage.

Defendant feared he would get beaten up but thought he could calm the situation down, so he unlocked the garage. Spindler came into the garage where an exercise machine was located, eventually exited, and yelled at defendant that he could not lock him out of the garage because he paid rent. Defendant replied he could have Hart come over and remove the exercise machine that was in the garage. Spindler yelled and came at defendant until he ran out of steam. After defendant told Spindler he was crazy, Spindler got in defendant's face and said, "That's right. I am crazy, and don't you forget it."

A scared and worried defendant went inside and locked himself in his bedroom. He got his gun from in between the mattress and box spring, believing he may need to defend himself. Seeing Spindler was in the front yard, defendant tried to go out the back. Spindler saw him and said, "Where do you think you're going, asshole?" Defendant turned around and saw Spindler coming towards him.

Defendant felt Spindler was going to attack him even though a picket fence stood between them. After defendant fired a warning shot, Spindler stopped, smiled, dialed his phone, and said he was calling the police to report defendant discharging a firearm in city limits. Believing the police would arrive shortly, defendant thought he should surrender peacefully. He first went to the backyard to surrender, but decided it was a terrible place to do this. Spindler was coming towards him and appeared to be aggressive. He told defendant that he was not afraid and yelled, "Shoot me, Motherfucker." Defendant shot

6

him. Spindler was turning around and going in the opposite direction when defendant shot him in the back.

Defendant admitted Spindler never harmed or threatened defendant during the bicycle incident, never threatened or harmed Hart, and he never laid a hand on defendant when they discussed their issues. In September 2013, defendant had written two pages of journal entries about Spindler, but never mentioned threats or fear regarding the incidents involving the paint chips or the neighbor. Five days before the shooting, defendant had written that Spindler told him he would try to control his volume and anger. There was no mention of threats or fears in the journal. While he journaled about his grievances with Spindler, defendant never wrote that Spindler was unstable or unpredictable, or that he was afraid of Spindler.

After Spindler told defendant he had screwed up for discharging a firearm in a residential area, defendant was concerned about what the police would say. Even though there were hammers and other potential weapons in the garage, defendant let Spindler go in there to get his keys. Defendant knew Spindler did not have a gun and that he did not take one of the available potential weapons when he was in the garage. He admitted being much larger than Spindler.

Dennis Bradshaw roomed with Spindler in 2012. Spindler was not normally an angry person, but he would get aggressive with and threaten other people in the house. His frequent outbursts became a source of discussion at the home's weekly group meeting. Spindler once threatened to throw a chair at Bradshaw and told him he could throw him to the ground and beat him up. He had threatened to choke and hit two other residents and had gotten into a fight with a young man at a hospital. The fight started when the young man swung at Spindler after he taunted the young man.

Rowenna Morrill lived at the same halfway house as Spindler and Bradshaw. Spindler was a jerk who was difficult to live with. He was regularly aggressive or intimidating when frustrated.

Defendant's close friend Eric Doyle was at defendant's home about a week before the shooting. As he and defendant were in the garage cutting wood for an addition to the house, Spindler engaged in odd behavior, talking and singing to himself, at times in loud bursts. At one point, Spindler loudly slammed the truck bed with all his force when Doyle and defendant were about 10 feet away. As Spindler walked into the house, he kicked the cords of saws that were plugged into an outside outlet.

The defense presented testimony of defendant's peaceful character from two people who attended Alcoholics Anonymous (AA) meetings with him and from his best friend in high school.

Defendant presented expert evidence that Spindler would have suffered from internal bleeding immediately after being shot. Blood drops went from the fence towards the front of the house. The larger group of blood drops were 16 feet nine inches from the fence and a smaller group of blood drops were four to five inches closer to the fence. Defendant could have been standing 16 feet nine inches from the fence when he shot Spindler. He was on the other side of the fence when he shot Spindler.

An acoustics expert testified it was not possible to determine distance from a 911 recording and the gun could have been a few feet from the phone when the shots were fired.

Spindler had marijuana in his system during the shooting. Marijuana is a potent psychoactive drug that can cause hallucinations, delusions, psychoses, and slower reactions, and can distort reality. Someone under the influence of marijuana can exhibit aggression, and may perceive a threat where none exists or feel invincible.

Dr. Kris Mohandie, a police, clinical, and forensic psychologist, testified as an expert regarding fight or flight, lag time, relapses in 12-step programs, and trauma following a deadly force encounter.

8

Fight or flight is an instinctive reaction when a person is presented with a threatening situation. In such situations, the options are to fight, flee, or (rarely) freeze. Eliminating flight as an option may make one feel trapped and more likely to fight.

A person may perceive events in slow motion or greatly sped up when in a threatening situation. The person may experience tunnel vision and make irrational decisions caused by not thinking clearly. Tunnel vision may cause the person to fail to perceive an escape route and focus on the threat in front of the person. A threat perceived over a period of time can enhance the fight or flight response.

Where a shooting victim engages in angry, obsessive behavior over six months, the shooter's perception that the victim was unpredictable would be enhanced, as would the shooter's sense of dread and fear. Threatening a third person on the day of the incident would increase the shooter's sense of fear and vulnerability. Combining this with the victim's volatile history would heighten the shooter's fight or flight response.

If the victim yells at the shooter for about 20 minutes and then advances on the shooter after the shooter goes into his house and gets a gun, then the shooter's perception of danger will increase. If the victim calls 911 after the shooter fires a warning shot and tells the shooter, "Come on, you gonna do something punk? I'm not scared of you motherfucker," and "Shoot me, Motherfucker," while moving toward the shooter would exponentially elevate the shooter's fight or flight response.

Lag time can cause a person to aim at one place on the body but actually hit another, such as when a police officer aims at a person's chest but shoots the person in the back. A person who relapses from a 12-step program would be more unpredictable and emotionally vulnerable.

Ending the life of another person can cause trauma and posttraumatic stress syndrome immediately after the event. Defendant's expressions of shame were consistent with someone suffering trauma after using deadly force that might be justified. His saying he should be behind bars is likewise not necessarily an indication of fact or an

9

admission to having committed a crime. Defendant's statements after the shooting were consistent with an irrational guilt that is a component of trauma. Some of his statements to the police were also consistent with the various steps of 12-step programs.

*Rebuttal*

A house manager at the transitional house Spindler lived in during 2012 testified that Spindler did not stand out as a particularly problematic resident, and he was not a common topic at the weekly meetings.

Defendant was born in December 1964, and weighed 315 pounds when arrested. Spindler was born in March 1959, and weighed 170 pounds.

DISCUSSION

I

*Sufficient Evidence of Murder*

Defendant contends there is insufficient evidence to support his murder conviction. We disagree.

On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560]; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) " 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

Defendant characterizes the shooting as a "tragic incident" arising from a conflict with Spindler that defendant did not initiate. According to defendant, Spindler's "obsessive, aggressive, and unpredictable behavior" over the six months they lived together culminated in Spindler's threatening behavior to Hart and defendant on the day of the shooting, which led defendant to either fear for his life or caused him to act rashly and under the influence of his fight or flight response in the face of legally sufficient provocation. From this, he concludes there is insufficient evidence to support his murder conviction because the prosecution failed to present evidence negating voluntary manslaughter, either through imperfect self-defense or heat of passion, and self-defense.

The prosecution presented evidence that defendant shot Spindler four times and killed him. He admitted the killing to the police and initially took responsibility for it, not claiming self-defense for nearly two and one-half hours, during which he made many incriminating statements. The man defendant shot was unarmed, and, wearing nothing but shorts, could not conceal any weapon.

" 'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) "Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. [Citation.] 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.] In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Firing multiple shots at the unarmed victim reasonably supports an inference of an intent to kill or implied malice. This inference is further support by defendant's

11

incriminating statements after his apprehension. That defendant had a handgun and was substantially larger than his unarmed victim could allow a jury to reasonably disregard the defense evidence upon which his claim relies. We shall not second-guess the jury's implicit rejection of the defense evidence and accordingly conclude substantial evidence supports defendant's conviction.

II

*Limiting the Expert's Testimony*

The defense expert Dr. Mohandie submitted a pretrial report in support of his anticipated testimony that included the following statement on subject precipitation:

"Subject precipitation is the role an injured person or decedent plays in his or her injury or demise through violent and provocative behavior. There are degrees of subject precipitation that range from no precipitation to significant subject precipitation. Teaching testimony would address this concept. The decedent reportedly engaged in behavior that, if true, is consistent with substantial subject precipitation, similar to that observed in suicide by cop cases."

The trial court granted the prosecution's motion to exclude this subject from the expert's testimony, finding little probative value as the expert was already allowed to testify regarding fight or flight behavior, and, since there was no evidence the victim was suicidal, referring to the victim's behavior as similar to suicide by cop would be inflammatory and immaterial.

Defendant asserts the court's ruling was an error that deprived him of his constitutional right to present a defense.

" 'In determining the admissibility of evidence, the trial court has broad discretion.' [Citation.] In particular, a trial court's decision on the admissibility of expert testimony is reviewed for an abuse of discretion. [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 226, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) There was no abuse of discretion here.

12

Testimony on subject precipitation addresses the victim's state of mind, which is of limited relevance in this murder prosecution. While the defendant's statement of mind is at issue as an element of the charged offense, what the victim was thinking is at best circumstantial evidence supporting an inference of how the victim acted. A victim's actions are relevant in a murder prosecution to self-defense, imperfect self-defense, and heat of passion voluntary manslaughter. However, there was no evidence Spindler was suicidal, which substantially limits the potential relevance of the proposed expert testimony. Allowing the expert to testify on "suicide by cop" ran the risk of distracting the jury with the irrelevant issue of whether Spindler was in fact suicidal. Furthermore, the expert testimony would address only a small portion of Spindler's actions, his behavior after defendant fired the warning shot, demonstrating he was armed and appeared willing to employ the firearm. The crux of defendant's claims of self-defense, imperfect self-defense, and heat of passion voluntary manslaughter was derived from Spindler's actions before defendant got the gun and fired the warning shot, Spindler's alleged aggressive and irrational behavior in the six months they shared the house, and in his behavior towards Hart that allegedly put defendant in the state of mind where he thought getting his gun and firing a warning shot was warranted. Given the minimal relevance of this part of the expert testimony and the real risk of distracting the jury with irrelevant and prejudicial issues, it was not an abuse of discretion to limit the expert testimony as the trial court did here. This is particularly true where, as here, the expert was allowed to testify extensively on the much more relevant issues of fight or flight, lag time, and how the trauma of killing another person can influence one's statements soon after the event.

We are not persuaded to reach a different conclusion by the cases defendant cites in support of his claim. *Boyd v. City & County of San Francisco* (9th Cir. 2009) 576 F.3d 938 (*Boyd*) involved a civil rights suit arising out of the fatal shooting of a person by the police. (*Id*. at pp. 941-942.) The appealing plaintiffs contended the trial court erred in

13

allowing expert testimony that the decedent was trying to commit "suicide by cop," claiming the testimony was irrelevant and prejudicial. (*Id.* at pp. 942-943.) The plaintiffs in *Boyd* presented evidence the decedent was trying to surrender to the police when he was fatally shot, while the officer testified that the decedent "ignored police commands to surrender and instead sat down on the dashboard of the SUV and reached both hands inside, as if to grab something." (*Id.* at p. 944.) Given this dispute over the decedent's acts before the shooting, the expert testimony was relevant to support one version of the facts over another (*ibid.*), and it was not an abuse of discretion to admit it (*id.* at p. 946).

The factual dispute in *Boyd i*s not present here. That dispute, over whether the decedent in fact surrendered to the police, makes the suicide by cop much more relevant than in the case before us. The fact that a federal court found it was not an abuse of discretion to admit this evidence under a very different set of facts does not lead us to conclude that the trial court's decision here was an abuse of discretion.

The other case cited by defendant, *Billington v. Smith* (9th Cir. 2002) 292 F.3d 1177, overruled on other grounds in *City of Los Angeles v. Mendez* (2017) 581 U.S. __, __ [198 L.Ed.2d 52, 59], is likewise inapposite. *Billington* was a police officer's appeal from the denial of his claim of qualified immunity for shooting and killing a motorist. (*Id.* at pp. 1179, 1183.) In so holding, the appellate court found, "[t]he law does not condemn citizens to death any time they resist arrest. Just as some decedents in police shooting cases appear to commit 'suicide by cop,' it is conceivable that some police officers could commit 'homicide by self-defense' by unconstitutionally and intentionally provoking an attack so that they could respond to it with deadly force." (*Id.* at p. 1191.) This statement does not support admitting the expert evidence in this case. Like *Boyd*, *Billington* is inapposite.

III

*Senate Bill No. 620*

Defendant contends and the Attorney General agrees that the matter should be remanded to allow the trial court to exercise its discretion on whether to strike the firearm enhancements. We agree.

On October 11, 2017, the Governor signed Senate Bill No. 620. As relevant here, Senate Bill No. 620 provides that effective January 1, 2018, sections 12022.53 and 12022.5 are amended to permit the trial court to strike an enhancement in the interests of justice. (§§ 12022.5, subd. (c), 12022.53, subd. (h).) Prior to this amendment, an enhancement under sections 12022.53 and 12022.5 was mandatory and could not be stricken in the interests of justice. (See, e.g., *People v. Kim* (2011) 193 Cal.App.4th 1355, 1362-1363; *People v. Felix* (2003) 108 Cal.App.4th 994, 999.)

The amendment to sections 12022.53 and 12022.5 applies retroactively to cases not final on appeal. (*People v. Arredondo* (2018) 21 Cal.App.5th 493, 507; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1090-1091.) When a trial court is unaware of sentencing discretion, the appropriate remedy is to remand for the court to exercise its discretion. (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) In the case of Senate Bill No. 620, a remand is required unless the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 427-428.)

Since the trial court did not indicate it would impose the highest sentence possible or in any way indicate remand would be futile, we shall remand for the trial court to exercise its discretion over the enhancements.

15

IV

*Dueñas*

Defendant contends remand is required for an ability to pay hearing with respect to the fines and fees imposed at sentencing. He cites in support *Dueñas, supra*, 30 Cal.App.5th 1157, which held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay.

We join the courts concluding *Dueñas* was wrongly decided and hold that defendant was not entitled to an ability to pay hearing for the conviction and operation assessments. (*People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, rev. granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060; *People v. Caceres* (2019) 39 Cal.App.5th 917, 920.) We therefore reject the contention.

DISPOSITION

The matter is remanded to the trial court to consider whether to exercise its discretion to strike defendant's firearm enhancements. The judgment is otherwise affirmed.

                                        /s/
                                        BLEASE, Acting P. J.

I concur:


    /s/
RENNER, J.

16

ROBIE, J., Concurring and Dissenting.

I concur in parts I through III of the Discussion but dissent to part IV addressing defendant's argument that *Dueñas* calls into question the imposition of the $40 court operations assessment and the $30 court facilities assessment without a determination of his ability to pay. (*People v. Dueñas* (2019) 30 Cal.App.5th 1157.) I agree with *Dueñas* that principles of due process would preclude a trial court from imposing the fine and assessments at issue if a defendant demonstrates he or she is unable to pay them. (*Dueñas*, at p. 1168.) I do not find the analysis in *Kingston*, *Hicks*, *Aviles*, or *Caceres* to be well-founded or persuasive and believe the majority has it backwards -- the cases with which the majority agrees were wrongly decided, not *Dueñas*. (*People v. Kingston* (2019) 41 Cal.App.5th 272; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted Nov. 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917.)

Defendant did not forfeit the ability to pay argument, as the People contend. It is true, as stated in *Castellano*, a trial court is required to determine a defendant's ability to pay only if the defendant raises the issue, and the defendant bears the burden of proving an inability to pay. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) In the absence of authority invalidating the statutorily mandated assessments based on a defendant's inability to pay at the time the trial court imposed them, however, defendant could not have reasonably been expected to challenge the trial court's imposition thereof. (*People v. Welch* (1993) 5 Cal.4th 228, 237 ["[r]eviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence"].)

1

I believe a limited remand under *Dueñas* is appropriate to permit a hearing on defendant's ability to pay the challenged assessments because his conviction and sentence are not yet final.  (See *People v. Castellano*, *supra*, 33 Cal.App.5th at pp. 490-491.)

 

                                                /s/ _____

                                                Robie, J.